No. 2--02--0128

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE
 ) 
Appeal from the Circuit Court

OF ILLINOIS,
                      ) 
of Lee County.

                           ) 

Plaintiff-Appellee,
 )

     ) 

v.
 ) 
No. 01--CF--127

               )

CAMILO E. GONZALEZ,
               )
 Honorable

                                )  
Tomas M. Magdich,
  

Defendant-Appellant.
    ) 
Judge, Presiding.

_________________________________________________________________

JUSTICE O'MALLEY delivered the opinion of the court: 

A jury convicted defendant, Camilo Gonzalez, of one count of predatory criminal sexual assault of a child (720 ILCS 5/12--14.1(a)(1) (West 2000)), one count of aggravated criminal sexual abuse (720 ILCS 5/12--16(d) (West 2000)), and two counts of child pornography (720 ILCS 5/11--20.1(a)(1)(ii) (West 2000)).  He appeals, and we affirm and remand with directions.

In May 2001, the State filed a four-count information against defendant.  Count I (predatory criminal sexual assault of a child) alleged that, in the summer of 2000, defendant intentionally placed his penis in the mouth of Jenna R., who was under 13 years of age at the time of the act.  Count II (aggravated criminal sexual abuse) alleged that, in the spring or summer of 2000, defendant intentionally placed his penis in the mouth of Charlene L., who at the time was between 13 and 17 years of age and at least five years younger than defendant.  Count III alleged that, in the spring or summer of 2000, defendant photographed Charlene L. with her mouth around the sex organs of another person.  Count IV alleged that, in the spring or summer of 2000, defendant photographed Travis W. with his genitals lewdly exposed.  The State alleged that Charlene L. and Travis W. were both under 18 years of age at the time the photographs were taken.

At trial, Bambi Glover testified that she was defendant's neighbor in May and June 2000.  She testified that, on June 20, 2000, Patricia Penner, defendant's then-girlfriend, showed Glover two photographs depicting oral sex.  Recognizing Charlene in both photographs, Glover took them to the police.  Although the photographs are not in the appellate record, the testimony at the trial revealed their content.  The first photograph (State's exhibit 1) shows Charlene performing oral sex on a male who is lying on a bed.  The second photograph (State's exhibit 3) is a close-up shot of Charlene performing oral sex on a male.  In neither photograph is the male's face visible.   

Glover acknowledged on cross-examination that she told the police that she recognized the man in State's exhibit 1 as "Rico," defendant's uncle, because of the scar on the man's right hand.  However, when shown State's exhibit 1 again on redirect examination, Glover testified that the man in the photograph was in fact scarred on his left hand.  Based on this, Glover admitted that she could not discern who was in State's exhibit 1 with Charlene.   Glover further testified on cross-examination that she told police that the man in State's exhibit 3 with Charlene was defendant.  She admitted, however, that she could not discern who was in State's exhibit 3 with Charlene.  Glover also admitted that she once had a relationship with defendant and that they have not been on good terms since it ended.  Glover also admitted that she had a felony conviction of delivery of cannabis.  

Patricia Penner testified that she rented defendant's trailer for 2½ months from April 2000 to late June 2000.  Penner testified that defendant came to the trailer every day after Penner moved in.  Defendant invited "many, many young people" to the trailer.  Charlene, Jenna, and Travis visited the trailer about once a week.  Charlene was often accompanied by Rico.  Penner testified that sometimes five to seven teenagers were in the trailer at once.  Penner testified that she did not invite the teenagers to the trailer and that they came to see defendant.  At one point Penner told defendant that she did not want any more teenagers in the trailer.  Penner admitted on cross-examination, however, that Charlene, Jenna, and others visited her apartment before she moved into the trailer.  Penner also testified that she and Jenna were close friends and that Jenna confided in her.    

Penner testified that, on May 27, 2000, defendant showed Penner a pack of photographs that included State's exhibits 1 and 3.  As he showed her the photographs, defendant laughed and said, "I just got my pictures back."  After he showed Penner the photographs, defendant placed them in his bedroom.  On June 10, 2000, Penner's 13-year-old daughter found the pictures and brought them to Penner, who later showed them to Glover.  Penner denied that she was in a relationship with defendant while she lived in the trailer.  Penner admitted that in May 2000 she spent two weeks in custody for violating the terms of probation imposed for her felony retail theft conviction. 

Lee County sheriff's detective David Glessner testified that in June 2000 he began to investigate the photographs Glover gave police.  With Penner's permission, Glessner searched defendant's trailer, where he found in a kitchen cupboard above the refrigerator negatives of the photographs of Charlene engaging in oral sex that Glover took from Penner.  Other than these photographs, Glessner found no pornographic material in the trailer.

Glessner testified that he interviewed defendant in the fall of 2000.  Glessner showed defendant the photographs, and defendant identified Charlene and Travis.  Defendant admitted that he took the photographs to show Charlene's mother because he did not approve of what Charlene and Travis were doing.   Glessner did not make a written record of defendant's statement because defendant could neither read nor write. 

Glessner testified that he interviewed Charlene in November 2000 and showed her the two photographs.  Charlene stated that she was performing oral sex on Travis in one of the photographs (State's exhibit 1) and on defendant in the other (State's exhibit 3).  Charlene told Glessner that she gave defendant oral sex because he threatened to tell her mother about her behavior with Travis.  When Glessner interviewed Travis later in November 2000, Travis stated that he was in one of the photographs.      

Glessner testified that he interviewed Jenna in January 2001.  Initially, while Jenna's mother and cousin were present, Jenna  denied that she performed oral sex on defendant.  However, once Jenna's mother and cousin left the room at Glessner's request, Jenna told Glessner that she indeed had performed oral sex on defendant.  Jenna explained that, around 9 p.m. one evening, defendant was driving her and Travis home on a gravel road when he pulled alongside a corn crib that was near what Jenna described as  a "pile of junk."  Defendant threatened to leave Jenna at the corn crib if she did not give him oral sex.  Glessner testified that, though he was unable to arrange for Jenna to show him the exact location, he followed the route that Jenna described in the interview and came across a silo standing near a dilapidated building located about a half-mile from defendant's trailer.  Glessner photographed the silo and showed the photograph to Jenna.  Jenna identified the photographed area as the location where she gave defendant oral sex.  Glessner acknowledged on cross-examination that there are probably a hundred silos in Lee County like the one he photographed.    

Glessner also admitted on cross-examination that he never located Rico or even learned Rico's last name.  Glessner testified that, though Glover had identified Rico as one of the individuals in the photographs, he did not attempt to interview Rico because defendant told Glessner during their interview in the fall of 2000 that Travis was the only male in the photographs.  Glessner acknowledged that, during a second interview in July 2001, defendant "alerted" Glessner to the "possible involvement" of Rico, but Glessner did not believe defendant and therefore did not pursue Rico.

Charlene testified that she was born on July 14, 1984.  Charlene testified that State's exhibits 1 and 3 were taken on May 10, 2000.  That night, defendant, Travis, Trina (Travis's sister), Jenna, and another girl picked up Charlene at her house after her mother left for work.  Charlene admitted that she did not want her mother to know she was leaving the house.  Charlene testified that the six of them drove to a field near defendant's trailer.  After they remained there for a time, defendant drove all of them home except for Travis and Charlene, who both accompanied defendant to his trailer, arriving about 1 a.m.  There, they watched a pornographic videotape on defendant's videocassette recorder (VCR) in the living room of the trailer while Penner was asleep in the bedroom.  Charlene and Travis became excited during the movie and went to Penner's son Kyle's bedroom where Charlene performed oral sex on Travis.  As this was occurring, Charlene saw flashes of light, which she initially regarded as lightning because it was storming outside.  Charlene then saw defendant standing in the doorway of the bedroom with a disposable camera and concluded that defendant had taken pictures of her and Travis.  Charlene testified that defendant took three or four photographs of her and Travis but did not take a close-up photograph of them.  Charlene identified State's exhibit 1 as a photograph of her performing oral sex on Travis.       

Charlene testified that, after defendant took the photographs of her and Travis, the three of them returned to the living room.  Soon after, defendant demanded that Charlene give him oral sex or he would show her mother the photographs he had taken of her and Travis.  Charlene initially refused, but she relented when she saw that defendant was serious because she did not want her mother to know she had been drinking alcohol at defendant's trailer.  She and defendant then went to the bedroom.  She sat on the edge of the bed and began performing oral sex on defendant as he stood in front of her.  She saw a flash of light close to her face and observed that defendant had taken a photograph of her.  Defendant said, "This is all I needed."  Charlene then stopped the oral sex because she felt defendant was "trying to get [her] in more trouble."  Charlene testified that State's exhibit 3 shows her performing oral sex on defendant.  Charlene testified that the male in the photograph could not be Travis because defendant never took a close-up photograph while she was performing oral sex on Travis.  Charlene also denied that Rico was the male in State's exhibit 3.  Charlene testified that she had babysat for Rico but denied she had had a relationship with him.    

Charlene testified that she had visited defendant's trailer over 50 times and that she drank a glass of wine in defendant's trailer on the night she performed oral sex on him. 

Travis testified that he was born on February 1, 1986. He testified that he became acquainted with defendant through a friend and thereafter visited defendant's trailer about four times a week.  Travis testified that he, defendant, and Charlene watched a pornographic movie in the living room of defendant's trailer one night.  Charlene began fondling Travis during the movie.  Travis asked her to go to the bedroom with him, and she agreed.  Inside the bedroom Charlene began performing oral sex on Travis with the lights off.  Travis saw flashes of light and then observed defendant standing in front of the bedroom window.  Because the night was stormy, Travis thought the flashes of light were lightning until defendant announced that he had taken pictures of Travis and Charlene.  Travis testified that defendant took no close-up pictures of them.  Travis identified both himself and Charlene in State's exhibit 1.  Although the man's face is not visible in State's exhibit 1, Travis identified himself because of the boxer shorts worn by the male and by the scar on the male's left hand.  Travis also identified himself and Charlene in State's exhibit 3, though he admitted he could not discern any clothing in the photograph except Charlene's shirt.  

Travis testified that he, defendant, and Charlene returned to the living room after defendant took the photographs.  Defendant then told Charlene that he would show Charlene's boyfriend Rico the pictures of her and Travis if she did not give defendant oral sex.  Although Charlene laughed at defendant's remark, Travis believed that defendant was serious and that Charlene really did not want Rico to see the pictures.  Travis then left the trailer.  He did not see whether defendant and Charlene went back to the bedroom together.  Travis further testified that, between 9 p.m. and 12 a.m. one night, defendant was driving Travis and Jenna home when he offered Jenna money to perform oral sex.  Jenna refused.  Defendant then drove Travis and Jenna to a location on a country road between Dixon and Sterling.  Travis saw a corn bin and a ruined building at this location.  Travis identified the location in the photograph of the silo that Glessner had taken.  Travis testified that he and defendant had been to the location several times before to drink.   Travis testified that, when they arrived at the corn bin, defendant threatened to leave Jenna there if she did not perform oral sex on him.  Jenna agreed to defendant's demand but appeared "upset."  Jenna and defendant stepped out of the truck and walked to the rear of the truck while Travis remained inside.  Travis did not see what transpired between defendant and Jenna outside of the truck.  Defendant later drove Travis and Jenna home. 

Jenna testified that she was 11 years old in the summer of 2000.  She testified that she became acquainted with defendant through Penner.  Jenna visited Penner first at her apartment and later at defendant's trailer after Penna moved in.  Jenna considered Penner a "second mother."  Jenna spent a significant amount of time at defendant's trailer in the summer of 2000 and sometimes spent the night.  During one of Jenna's visits to the trailer, defendant asked her to give him oral sex.  When she refused, defendant became upset, stormed into the bathroom, and slammed the door.  Penner woke up from the noise, was told by Jenna what had happened, and then began arguing with defendant.  Jenna estimated that this incident occurred in midsummer 2000.  Jenna testified that defendant asked for oral sex on another occasion while he was driving her home from his trailer, but she refused that request as well.

Jenna testified that about two to three weeks after defendant asked her for oral sex in the trailer, he drove her and Travis to a corn bin on a gravel road.  Jenna identified the location in the photograph of the silo that Glessner had taken.  Jenna testified that the three of them stepped out of the truck once they arrived.  Defendant then asked Jenna to give him oral sex.  When she refused, defendant threatened to abandon her at the corn crib if she did not comply.  When Jenna continued to refuse, defendant and Travis drove off without her.  When they returned five minutes later, defendant again asked Jenna for oral sex.  Jenna refused, and defendant renewed his threat to abandon her at the corn crib.  Frightened because she did not know how she would otherwise get home, she agreed to defendant's demand and performed oral sex on him behind the truck until he ejaculated.  Jenna noticed that defendant was not circumcised.  Afterwards, Jenna remarked to Travis that defendant's crotch "stunk" and that she felt like vomiting.    

Although Jenna was unable to give precise dates for the incident at the corn crib and the two previous times that defendant asked her for oral sex, she testified that the incidents all occurred while Penner was living in defendant's trailer.    

 On cross-examination, Jenna acknowledged that she did not tell Detective Glessner about the incident at the corn crib during their interview until after her mother and cousin left the room.  Jenna testified that she did not reveal the incident initially because she did not want her mother to find out.  Asked why she did not simply get back into the truck at the corn crib when defendant threatened to abandon her, Jenna testified that she did not know.  Asked why she did not ask Travis for help, Jenna testified that she did not believe Travis could have helped her.  Asked why she did not simply refuse defendant's request for oral sex and then walk back to the trailer, Jenna testified that she did not know how to get from the corn crib to the trailer.  Jenna admitted that she did not ask Travis to remain with her at the corn crib if defendant decided to leave.    Jenna also admitted on cross-examination that she visited defendant's trailer after the corn crib incident.  She also admitted that she and Penner joked about defendant's circumcision.  The parties then stipulated that defendant underwent circumcision on June 6, 2000. 

The State rested.  Defendant was the only witness for the  defense.  Defendant testified that he was born on May 26, 1968.  He testified that Penner and her son Kyle lived with him in his trailer in the summer of 2000 and that he had a sexual relationship with Penner during that time.  Defendant testified that Travis, Charlene, Jenna, and the other "kids" did not start visiting the trailer until Penner invited them after she moved in.  Defendant testified that Charlene had a relationship with Rico, defendant's uncle, and would sometimes stay overnight at the trailer.  Defendant testified that the "kids" were sometimes in the trailer in the evening when alcohol was present.  Defendant testified that he was "always careful" at these times.  Defendant admitted that he knew Travis was 14 years old, Charlene was 16 years old, and Jenna was 11 years old during the summer of 2000.  

Defendant denied ever watching a pornographic movie with Charlene and Travis or demanding oral sex from Charlene.  Defendant testified that State's exhibits 1 and 3 depict Charlene performing oral sex on Travis.  Defendant recognized Travis by his boxer shorts.  Defendant testified that he first saw the photographs on May 26, 2000, when he took his disposable camera to the pharmacy to have pictures developed.  When he saw the photographs of Charlene and Travis having oral sex he told Penner to destroy them and said that he no longer wanted the "kids" coming to the house.  The "kids," however, continued visiting the trailer.  Defendant denied that he took the photographs.  He testified that everyone in the trailer had access to the disposable camera and that he did not know who took the photographs.  

Defendant acknowledged that he told Detective Glessner during their first interview in the fall of 2000 that he had taken the photographs.  Defendant testified that he told Glessner in their second interview that Rico had taken the photographs.  On cross-examination, defendant testified that Rico had taken the photographs and that defendant had initially lied to Glessner in order to protect Rico, who was on parole.  When confronted with the fact that he had previously testified that he did not know who took the photographs, defendant testified that he was confused when he gave the prior testimony.       

   Defendant testified that Penner first invited Jenna to the trailer.  Jenna would visit the trailer once a week and spend the night.  Defendant testified that he drove Jenna home from the trailer on at least two occasions but denied ever asking Jenna for oral sex.  Defendant further denied ever having been to the silo depicted in Glessner's photograph.

Defendant further testified that his circumcision in June 2000 entailed a three-week recovery period.  Defendant admitted that he had been convicted of "numerous crimes" including criminal damage to property in 1999 and obstruction of justice in 1994.

Defendant was convicted on all counts.  His first argument on appeal is that his trial attorney provided ineffective assistance of counsel by failing to move the trial court to sever count I of the information (charging sexual assault of Jenna) from the remaining counts for trial.  

Charges against a defendant may be joined if the offenses are based on two or more acts that are part of the same comprehensive transaction unless it appears that the defendant will be prejudiced by the joinder of separate charges.  
People v. Patterson
, 245 Ill. App. 3d 586, 587 (1993).  A defendant is not prejudiced by the improper joinder of charges if, had separate trials been given, defendant still would have been convicted.  
Patterson
, 245 Ill. App. 3d at 591; 
cf.
 
People v. Peterson
, 108 Ill. App. 3d 856, 860 (1982); 
People v. Sockwell
, 55 Ill. App. 3d 174, 176-77 (1977). 

Illinois courts address ineffective assistance of counsel claims under the two-prong test established in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and  
People v. Albanese
, 104 Ill. 2d 504, 526-27 (1984).  Under 
Strickland
, a defendant must prove (1) that defense counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for this substandard performance, the result of the proceeding would have been different.  
People v. Alvine
, 173 Ill. 2d 273, 293 (1996).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  Mere conjecture and speculation are not sufficient to establish this probability.  
People v. Gosier
, 165 Ill. 2d 16, 24 (1995).  Because a defendant's failure to establish either part of the 
Strickland
 test will defeat an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.  Accordingly, a court considering a claim of ineffective assistance "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Defendant's argument is directed almost exclusively at the first prong of 
Strickland
; his attention to the second prong is limited to the general statement that the "prejudice to the defendant in having all charges with separate victims, separate acts and separate occurrences heard all at once by the same jury was great."  Because defendant's attempt to satisfy the second prong of 
Strickland
 is limited to a single conclusory remark, we would be justified in finding the point waived.  
People v. Rockey
, 322 Ill. App. 3d 832, 839 (2001) ("Arguing an issue in a conclusory fashion or failing to adequately brief or argue an issue results in the waiver of the issue").  However, because our addressing the merits of defendant's 
Strickland
 claim will serve to clarify Illinois law in an important respect, we will relax the waiver rule here.  See 
People v. Farmer
, 165 Ill. 2d 194, 200 (1995) ("The waiver rule is one of administrative convenience rather than jurisdiction, and the goals of obtaining a just result and maintaining a sound body of precedent may sometimes override considerations of waiver").   

Defendant cites two fairly recent appellate court cases, 
People v. Karraker
, 261 Ill. App. 3d 942 (1994) (3d Dist. 1994), and  
People v. Lewis
, 240 Ill. App. 3d 463 (1992) (1st Dist. 1992), both of which found a trial attorney ineffective for not seeking severance of charges.  
However, the analyses in these cases do not comport with 
Strickland
 because they suggest that a defendant meets his burden under 
Strickland
 simply by showing that joinder of the charges was improper and that no conceivable trial strategy justified trial counsel's failure to seek severance.

In 
Karraker
, the defendant was convicted of unlawful possession of a weapon by a felon, unlawful use of a weapon (manufacture of a machine gun), and theft.  He claimed that his trial counsel was ineffective for failing to sever the charges for trial.  The appellate court agreed, analyzing the ineffectiveness claim as follows:

"Here, the alleged offenses were completely unrelated, they took place days and months apart, and were beyond a doubt not part of the same comprehensive transaction.  In addition, the defendant raised totally different defenses to the three charges. *** Most strikingly, however, he raised an entrapment defense to the charge in count II that he manufactured a machine gun.  Raising this defense necessarily required that he admit to having committed the alleged offense. [Citation.] Defense counsel's failure to recognize the prejudicial impact such an admission would have in the context of the other charges is incomprehensible.  

In failing to request a severance of the unrelated charges, trial counsel's representation fell far below any objective standard of reasonableness.  Multiple unrelated charges, coupled with an admission of having committed one of the offenses, may well have swayed the jury to convict the defendant for being a bad person, rather than on the merits of the State's proofs."  
Karraker
, 261 Ill. App. 3d at 953.

In 
Lewis
, the appellate court held that defense counsel was ineffective for failing to have two murder charges severed.  The court reasoned:

"Our review of the record here leaves no doubt that defense counsel should have filed a motion to sever the two murder charges.  According to the evidence, there were different motives for the murders of Venus and Nimrod, and the murders occurred at different locations and on different days.  That the victims' bodies were discovered in the same location, and there were common witnesses to the two murders, does not lead to the conclusion that the murders were part of the same comprehensive transaction. [Citations.]

We can conceive of no legitimate trial strategy in defense of counsel's failure to move for a severance.  Instead, we are struck by the distinct disadvantage defendant suffered from the joint trial.  Defendant's trial counsel raised markedly different defenses to the two murder charges, denying defendant had any involvement in Venus' murder while admitting that defendant stabbed Nimrod, but claiming that Lovie struck the fatal blow, and that the murder was justified.  Certainly, counsel's task of convincing the jury of each of these theories was made more difficult by having to simultaneously argue that a completely distinct theory applied to the other murder.  Also, we cannot underestimate the impact the cumulative evidence regarding the two murders must have had on the jury. [Citation.]  Accordingly, there is no doubt that defendant was prejudiced by defense counsel's failure to move to sever the charges."  
Lewis
, 240 Ill. App. 3d at 468-69. 

Karraker
 and 
Lewis
 both find the 
Strickland
 test satisfied entirely with proof that the joinder of charges was manifestly improper and that trial counsel's failure to seek severance fell below an objective standard of reasonableness.  Although both cases cite "prejudice" in support of their holdings, neither applies the second prong of 
Strickland
, which requires that the defendant demonstrate a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  In our view, the second prong of 
Strickland
 requires the defendant to show that there is a reasonable probability that he would have been acquitted in separate trials had the counts been severed.

There are scant post-
Strickland
 Illinois cases in the published reports addressing ineffectiveness claims relating to motions for severance of charges.   Aside from 
Karraker
 and 
Lewis
, the only case we have come upon is 
People v. McLemore
, 203 Ill. App. 3d 1052 (5th Dist. 1990), where the court rejected a claim of ineffectiveness based on trial counsel's failure to seek severance of charges.  The court explained:

"The joinder of the charges was reasonable since the testimony of the arresting officers was applicable to both defenses and to require an additional trial would have been judicially inefficient.  While it would have been an easy matter for counsel to have filed a motion for severance, the defendant has not established that there was any reasonable probability that the result would have been different under the circumstances of this case."  
McLemore
, 203 Ill. App. 3d  at 1057-58.

The first half of this analysis concerns factors that are irrelevant to both prongs of the 
Strickland
 test, and the second half is merely conclusory.  Thus, 
McLemore
 offers no guidance on the issue at hand.  We agree with decisions in other jurisdictions holding that a defendant's claim that he was prejudiced by his trial counsel's failure to seek severance of charges depends on how the defendant would have fared in separate trials.  
See, 
e.g.
,
 
State v. Lucky
, 45 Cal. 3d 259, 278, 753 P.2d 1052, 1063, 247 Cal. Rptr. 1, 11-12 (2001); 
Holloway v. State
, 245 Ga. App. 510, 514, 537 S.E.2d 708, 712  (2001);
  
State v. Warren
, 55 Wash. App. 645, 655, 779 P.2d 1159, 1165 (1989).  This approach is analogous to the analysis employed in cases where the defendant claims his trial counsel was ineffective for seeking to sever the defendant's case from a codefendant's.  In that scenario, the defendant must show a reasonable probability that he would have been acquitted in a separate trial.  See, 
e.g.
, 
People v. Carter
, 168 Ill. App. 3d 237, 250 (1988).

Here, defendant fails to establish a reasonable probability that he would have been acquitted in separate trials had count I been severed from counts II, III, and IV.  We note, first, that defendant does not dispute the State's proof on the age-related elements of the four charges.   

As for the remaining proof, the State charged in count I that defendant penetrated Jenna's mouth with his penis.  Jenna testified that defendant threatened her into performing oral sex on him behind a truck at a rural location.  Although Travis did not see what occurred between defendant and Jenna behind the truck, he did hear defendant's threats and Jenna's eventual assent and see them walk behind the truck where they remained for a time.  Against this evidence, defendant denied that he ever had oral sex with Jenna or had ever been to the rural location where the incident allegedly occurred.  There was no reasonable probability that defendant would have been acquitted had he been tried separately on count I.  

Counts III and IV charged, respectively, that defendant knowingly photographed Charlene performing oral sex on another person and that he knowingly photographed Travis with his genitals exposed. Charlene and Travis both testified that defendant photographed them engaged in oral sex.  Their accounts were corroborated by two photographs introduced at trial, each of which shows Charlene performing oral sex on a male whose genitals are visible.  Travis identified himself as the male in both photographs.  While Charlene contradicted Travis on this point, claiming that one of the photographs depicted defendant because he had taken it while Charlene performed oral sex on him, Charlene and Travis agreed that Travis was depicted in the other photograph with his genitals exposed.  Defendant offered only general denials to dispute this evidence.  There was no reasonable probability that he would have been acquitted on counts III and IV.       The State charged in count II that defendant penetrated Charlene's mouth with his penis.  Charlene testified that, following his photographing of her and Travis, defendant threatened Charlene into performing oral sex on him.  Although Travis had left the trailer before the oral sex between defendant and Charlene allegedly occurred, Travis testified that he heard defendant threatening Charlene and believed that defendant was serious in making the threats.  Defendant merely denied that the oral sex occurred.  There was no reasonable probability that defendant would have been acquitted on count II.  

Therefore, because defendant has not shown that his trial counsel's failure to move for severance worked any prejudice, he has not carried his burden under the second prong of 
Strickland
.  

[Nonpublishable material under Supreme Court Rule 23 removed here.]
 
 Defendant also argues that the trial court failed to admonish him properly per Supreme Court Rule 605(a) (188 Ill. 2d R. 605(a)) and that this failure led him to forgo filing a motion to reconsider his sentence.  The State agrees that the admonition was flawed, as do we.  For instance, the trial court told defendant that the appellate court could increase his sentence if he appealed.  As the trial court's admonishment was defective, we remand this cause so that defendant may receive the proper admonition and file a motion to reconsider his sentence. 

For the foregoing reasons, we affirm the judgment of the circuit court of Lee County but remand this cause with directions.  
 

Affirmed and remanded with directions.  

BOWMAN and CALLUM, JJ., concur.