NOTICE

Decision filed 06/02/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 160469-U

NOS. 5-16-0469, 5-16-0471 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Clinton County. |
| | ) | |
| v. | ) | Nos. 15-CF-61, 15-CF-91 |
| | ) | |
| JAMES R. BLAIR, | ) | Honorable |
| | ) | Stanley M. Brandmeyer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Overstreet and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Joinder was proper where there was no reasonable probability defendant would have been acquitted of the charges against him, and he is not entitled to a new trial where he failed to establish a *Brady* violation.

¶ 2    In this consolidated for decision only appeal, defendant, James Blair, appeals from his convictions in two joined criminal cases. On appeal, defendant asserts that the circuit court abused its discretion in joining the charged offenses for trial. For the following reasons, we affirm.

1

¶ 3                                  I. Background

¶ 4     On April 25, 2015, a vehicle search by Sergeant Kyle Markus, pursuant to a search warrant, uncovered four bags of cannabis and two pills of oxycodone in defendant's vehicle. Shortly thereafter, on April 27, 2015, defendant was charged by criminal information in case number 15-CF-61 for the (1) unlawful possession of a controlled substance (count I) (720 ILCS 570/402 (West 2012)) and (2) unlawful possession of cannabis with intent to deliver (count II) (720 ILCS 550/5 (West 2012)).

¶ 5     On June 22, 2015, the defendant was charged by indictment by a grand jury under case number 15-CF-91 for the following: (1) armed robbery with a 20-year gun enhancement (count I) (720 ILCS 5/18-2(a)(3) (West 2012)); (2) aggravated battery with a firearm (count II) (*id.* § 12-3.05(e)(1)); (3) attempted aggravated battery (counts III and V) (*id.* § 8-4(a)); (4) reckless conduct (counts IV and VI) (*id.* § 12-5(a)(1)); and (5) aggravated assault (count VII) (*id.* § 12-1(a)). Defendant was accused of committing the above seven counts on April 25, 2015, the same day as the offenses in case number 15-CF-61.

¶ 6     On January 4, 2016, the State filed a motion for joinder of related prosecutions, seeking to join case numbers 15-CF-61 and 15-CF-91. At the hearing on the State's motion, the State asserted that "these two cases are factually connected [because] *** each *** alleges conduct—criminal conduct attributed to Mr. Blair on April 25, 2015." Defense counsel opposed the State's motion for joinder because defendant had been originally charged with two drug-related offenses (case number 15-CF-61) after police discovered cannabis and oxycodone in his vehicle. Defense counsel further stated:

2

"Had the facts bore from the State's point of view, that, for example, my client was accused of stealing drugs from these people, then I can understand the need for joinder; but the fact that drugs were found in my client's vehicle *** is irrelevant and immaterial to whether or not he took money from the individual charged in the indictment or pointed a gun at other individuals charged in the indictment and has no bearing upon his guilt or innocence, quite frankly, of drugs found in his vehicle. That's a whole separate issue."

Following argument by both parties and defense counsel's objection, the circuit court, relying on *People v. Williams*, 204 Ill. 2d 191 (2003), granted the State's motion for joinder. The record demonstrates that the State offered, and defendant rejected, "an offer for an open plea to one of the counts [in exchange for] dismissing the armed robbery" charge in case number 15-CF-91. Shortly thereafter, the court granted defendant's motion to continue to obtain additional time to interview Spencer Bagwell, a crucial witness to defendant's case.

¶ 7     On August 23, 2016, a three-day trial commenced, and the following evidence was adduced. The State called Stephanie Hinojosa, defendant's girlfriend, who testified to the following. Stephanie slept at defendant's parents' home in Trenton, Illinois, on April 24, 2015. At approximately 2 a.m. on April 25, 2015, following defendant's request, Stephanie drove him to the Shell gas station in New Baden, Illinois, to purchase liquor. At approximately 4:25 a.m., defendant asked Stephanie to borrow her vehicle, but she declined,[1] so defendant drove his parents' truck. At 6 a.m., defendant returned home to wake up Stephanie. Shortly thereafter, Stephanie and defendant left in separate vehicles to visit Stephanie's mother's home, but defendant never arrived. For nearly three hours,

_____

[1]Defendant's exact departure time from his parents' home is unclear from the record, although defendant and Stephanie exchanged text messages at 4:25 a.m. on April 25, 2015.

Stephanie was unable to get ahold of defendant. During that time, however, she discovered his vehicle "wrecked" in a ditch. Stephanie recalled that defendant wore gray and white pajama pants and a white t-shirt on April 25, 2015.

¶ 8 Next, Nicholas Pruitt, a 911 telecommunication deputy for the Clinton County Sheriff's Office, testified to the following. Deputy Pruitt was on duty in the early morning hours of April 25, 2015, when he received an emergency call from Ryan Vandever regarding a shooting in Aviston, Illinois. On cross-examination, Deputy Pruitt stated that he had spoken with Ryan, while Deputy Jodi Nehrt, his partner, talked to another caller, identified as Nicole Grantham, regarding the shooting. While on the call, Ryan stated that he did not know who shot him.

¶ 9 Deputy Nehrt, a 911 telecommunication deputy for the Clinton County Sheriff's Office, testified to the following. On April 25, 2015, Nicole identified herself on the 911 recording and stated that she thought she recognized the shooter's voice. Nicole later identified the shooter as defendant. On cross-examination, Deputy Nehrt admitted that Nicole did not want to point fingers, but she believed defendant was the shooter.

¶ 10 Detective Scott Voss, a 13-year detective with the Clinton County Sheriff's Office, testified to the following. At approximately 6:16 a.m., Detective Voss started a walkthrough video recording of the home. Detective Voss also interviewed Ryan at a local hospital where he informed Detective Voss that he woke up on April 25, 2015, to his roommate, Haley Schroeder, yelling that someone had a gun in the house. At that time, Ryan was sleeping in the basement with his girlfriend, Nicole. From the stairwell, Ryan looked up from the basement and saw a "subject standing there with a gun"

4

demanding money and drugs. After the first shot, Ryan gave the shooter his wallet and a hitter box containing cannabis. The shooter's second shot hit Ryan in the leg. The shooter then pistol-whipped Ryan in the face.

¶ 11    According to Detective Voss, Ryan believed defendant was the shooter because he "fit the general description, the height, build and he said the terms ghetto like James Blair did." When Detective Voss pressed further to ensure Ryan had properly identified defendant, Ryan responded that "he had bad relations with [defendant] over a relationship with [defendant's] girlfriend or ex-girlfriend." On cross-examination, Detective Voss acknowledged that Ryan was not positive defendant was the shooter at the hospital.

¶ 12    Jacob Hinkle testified to the following. On April 25, 2015, Jacob drove defendant to his vehicle before defendant was arrested. As Jacob and defendant approached defendant's vehicle, Trenton police officer Ryan Weh was standing near defendant's vehicle. Defendant requested Jacob to drop him off some distance away before Jacob approached Officer Weh. Defendant informed Jacob that he "would explain it later because he messed up bad." On cross-examination, Jacob confirmed that defendant had requested a ride to his parents' house and then his vehicle on April 25, 2015.

¶ 13    Officer Weh testified to the following. On April 25, 2015, Ryan informed Officer Weh that "a male subject came in yelling that he needed money for Tippy and then the next thing he knows he was shot." While EMS was rendering medical assistance to Ryan, Nicole informed Officer Weh that "she could not see [the shooter's] face, but he was about 5'6," *** medium build and sounded like a subject named James Blair." Nicole

5

recalled that the shooter was wearing dark sweatpants with gray stripes and a long-sleeve dark top.

¶ 14    Officer Weh received a call from the Aviston Police Department that Stephanie had reported defendant's "vehicle wrecked somewhere on New 50 past Trenton." Following the call, he found defendant's vehicle located near Shady's Bar in Summerfield, Illinois, with major front-end and tire damage. Officer Weh observed a dark-colored shirt with a distinguished red mark around the collar in the roadway near Shady's Bar, roughly 50 yards from defendant's vehicle. Stephanie did not know if the shirt belonged to defendant. After Officer Weh was advised that defendant's vehicle would be towed, Jacob arrived and informed Officer Weh that defendant had asked him to change his flat tire. When Officer Weh looked south towards downtown Summerfield, he saw defendant standing in a residential yard. Officer Weh was instructed by Aviston Police Chief Mark Taylor to arrest defendant. At the time of arrest, defendant was wearing gray sweatpants with black stripes, and he had $625 cash in his pocket. Later, $1632 cash was found in defendant's wallet. Shortly thereafter, Officer Weh secured the dark-colored shirt, originally seen on the roadway, after Jacob informed him that defendant had placed it on the backseat floor of Jacob's vehicle.

¶ 15    Sergeant Kyle Markus of the Aviston Police Department testified to the following. Following a conversation with Officer Weh, Sergeant Markus lawfully obtained a search warrant for defendant's vehicle. The search uncovered a yellow pill bottle that contained two pills of oxycodone and a clear plastic container with a red lid that contained four bags of cannabis. On cross-examination, Sergeant Markus acknowledged that he did not

6

find a drug scale or hitter box in defendant's vehicle. On redirect, Sergeant Markus indicated that there was over $1600 cash recovered from defendant. Given that the cannabis was individually packaged in four separate bags, a total of 28 grams, and defendant had a large sum of money on him, Sergeant Markus, based on his experience, believed the cannabis was intended for sale.

¶ 16 Brennan Richter testified to the following. Brennan lived in Aviston, Illinois, with his girlfriend, Haley Schroeder, and his friends Ryan, Nicole, and Emily Summers. On April 25, 2015, Brennan was standing in the garage when he noticed someone going through Nicole's parked car. The subject immediately approached Brennan with his gun cocked and "mentioned something about Tippy's money," that "he [was] not messing around and *** to let him inside" the house. Once inside the house, the shooter, within the first couple of seconds, noticed a "fake camera," knocked it on the ground and stated, "no fucking camera." According to Brennan, only two or three people, aside from the roommates, knew about the camera. Defendant, however, became aware of the camera in October or November 2014 when Ryan informed him that it was "fake."

¶ 17 The shooter fired the first shot down the stairs as Ryan, Nicole, and Haley ascended the stairs. Brennan believed that the shooter's aggression was directed primarily at Ryan because he was not interested in Nicole's money. Instead, the shooter took Ryan's money and a pair of his designer jeans. The second gunshot struck Ryan in the leg, and then the shooter pistol-whipped Ryan in the face. Before the shooter fled the home and the roommates called 911, he pointed the gun at Haley and Brennan in the living room, pulled the trigger and it "click[ed]."

7

¶ 18   After emergency personnel arrived, Brennan mentioned to Haley that he "d[idn't] know the guy's name, but I am pretty sure it's Stephanie Hinojosa's boyfriend." Brennan informed police that the "intruder was the same person who *** come [*sic*] on to Emily" at a bar, and defendant was this individual. Brennan also identified defendant by the way he walked and talked "like a thug gangster." Although defendant had attempted to hide his identity by wearing gloves, "dark long pants, [a] dark hooded sweatshirt with a hood on his head and *** a handkerchief or bandana around *** his face," Brennan "was able to see his eyes, his cheeks, most of his nose," and when the bandana slid down while he moved and talked, "[y]ou could see *** part of his mouth ***." Several weeks after his initial statement, Brennan identified defendant in a supplemental statement at the Aviston Police Department, at which time a picture of defendant was sitting on the desk.

¶ 19   On cross-examination, Brennan indicated that he had been up for 12 hours on April 25, 2015, but he was not under the influence of drugs or alcohol. In his first written statement, Brennan did not identify the shooter by name because he did not know defendant's name. The only information known to him at that time was that the shooter was Stephanie Hinojosa's boyfriend. Lastly, at the time he gave his supplemental statement, Brennan stated that "[b]efore I saw that photograph [at the Aviston Police Department], no, I hadn't made up my mind that it was [defendant]."

¶ 20   Haley Schroeder testified to the following. On April 25, 2015, Haley arrived home at 3 a.m. after she had worked a late shift at work. After Haley heard a gunshot, she saw Brennan with the shooter, at which time, the shooter said "something *** along the lines where is Ryan." After Haley woke up Ryan, she was walking upstairs when she "felt air

8

wiz by" her leg from a bullet. A second shot was fired, striking Ryan in the leg. Ryan then crawled up the stairs to hand money to the shooter and was pistol-whipped in the face. The shooter then pointed his gun at Haley and Brennan before he fled the home.

¶ 21 Haley confirmed that the shooter, "right away," in fact, "[t]he second he stepped foot into the house," grabbed the camera, threw it down, and broke it. When asked to identify the shooter's speech, Haley stated that he spoke "ghetto," similar to "East St. Louis talk." Haley knew the shooter was defendant, based on his distinct eyes and voice, but did not know his name, and he appeared to be "on something." Haley could see defendant's eyebrows, eyes, the top of his nose, two inches below his hairline and above his cheekbones.

¶ 22 Nicole testified to the following. After Haley went downstairs to wake up Nicole and Ryan, Nicole and Haley were walking upstairs when a shot was fired. Both women were untouched. While Ryan looked for money in the basement, the shooter shot downstairs again, striking Ryan in the leg. After Ryan crawled up the basement stairs with money, the shooter pistol-whipped him with the gun. Ryan instructed Nicole to find his jeans and wallet. Nicole complied and handed over $400. The shooter then pointed his gun at Brennan and Haley in the living room, pulled the trigger and the gun clicked. The shooter grabbed Ryan's jeans and ran out of the home. During the incident, Nicole recognized defendant as the shooter because the shirt covering his mouth and nose had fallen down several times, and he spoke "ghetto." After defendant left the home, Nicole called 911 and told the dispatcher the shooter was James Blair.

9

¶ 23   On cross-examination, Nicole acknowledged that she did not name defendant in her first written statement because she agreed "there was still a small bit of [her] that wasn't for sure." When identifying defendant as the shooter, she "wasn't 100 percent positive but *** 98-99 percent" certain. Nicole acknowledged that she responded "no" when the 911 dispatcher asked her if she could identify the shooter. Regardless, Nicole stated that she "saw his whole face at some point" during the incident, even though defendant covered his nose and mouth with a handkerchief. Nicole did not address the defendant by his name during the incident because she was scared. On redirect, Nicole stated that she had identified James Blair as the shooter in her supplemental statement on April 26, 2015.

¶ 24   Chief Taylor testified to the following. During the search of defendant's vehicle, a pair of True Religion designer jeans were discovered. On cross-examination, however, Chief Taylor stated that the discovered jeans did not belong to Ryan.

¶ 25   Ryan testified to the following. Prior to April 25, 2015, defendant and Ryan knew each other. Michael Tipton, referred to as Tippy, was Ryan's acquaintance. Ryan was not aware that he owed Tippy money, but when defendant "smacked me in the head with the gun, he yelled something along the lines that this was for Tippy's money or I should have paid Tippy." Ryan did not identify the shooter as defendant until he returned home from the hospital. Ryan "didn't think about who the shooter was at all. It didn't cross my mind. I was more worried about my leg and everything else while I was at the hospital." When he returned home, "[i]t clicked. *** [His] demeanor, the way he talked, the way he acted, our prior—you know, [defendant] don't [*sic*] like me" because defendant knew Ryan and

10

Stephanie had sex after she broke up with defendant. Although defendant attempted to disguise his identity, Ryan saw the top of his nose up to his forehead. Defendant wore dark clothing, specifically, black pants with stripes, a hoodie, and a t-shirt wrapped around his face.

¶ 26    Next, Carl Durkee testified to the following. At approximately 6:30 a.m. on April 25, 2015, Carl saw defendant's vehicle, an orange Mitsubishi, almost lose control as he drove "through our subdivision at a pretty good clip." Carl lived on the west side in Trenton, Illinois, just one block from Old Route 50. At 7:45 a.m., Carl was driving to O'Fallon, Illinois, when he saw defendant walking in a field near Trenton. As Carl approached St. Clair County, he saw the same orange Mitsubishi, now with a flat tire, at a tavern. Later that day, Carl recognized defendant's vehicle at JDS Towing.

¶ 27    Spencer Bagwell testified to the following. After the April 25, 2015, incident, Bagwell saw defendant at Jim's Formal Wear and Casey's General Store. While in the checkout line at Casey's, defendant told Bagwell that "he shouldn't have shot nobody [*sic*]" or had a gun with him. Bagwell wrote a statement on June 10, 2015, in Sergeant Markus's presence, that defendant had told him that he should not have had the gun and "he got popped for weed." Bagwell also acknowledged that, following a DUI on May 13, 2015, a petition to revoke court supervision was pending when he provided his statement to police on June 10, 2015. The following colloquy took place:

> "Q. [MR. HUDSPETH:] There was never any discussion or conversation or promise made to you that—or suggestion that if you wrote a statement about James Blair it was going to help you with your DUI, did it?
> "A. [BAGWELL:] No, sir. Not at all.
> * * *

Q. And you're still on court supervision or probation as of now for that DUI, right?

A. Yes, sir.

\* \* \*

Q. Isn't it true that there have been no discussions, no promises of any leniency, no deals made of any kind relating to your testimony here today?

A. No, sir.

Q. This case and your case are separate and always have been, isn't that right?

A. Yes, sir."

On cross-examination, Bagwell admitted that his June 10, 2015, statement did not reference defendant shooting anyone. Bagwell indicated, however, that he had verbally informed Sergeant Markus of those details on June 10, 2015. Following Bagwell's testimony, defense counsel moved for a directed verdict, asserting that there was not enough evidence to submit to the jury, and the case was based on suspicion. The circuit court denied defense counsel's motion.

¶ 28    James Baylor testified to the following for the defense. Baylor and Bagwell had talked to defendant for 20 or 30 minutes at a Kountry Store in April 2015. Baylor stated that defendant never said anything about a gun or shooting anyone, and Bagwell never said anything about making a statement to law enforcement during the conversation.

¶ 29    Sergeant Markus testified to the following. Sergeant Markus confirmed that Bagwell never told him, either verbally or in written form, that defendant had shot anyone. On cross-examination, he indicated that Bagwell was not released on the petition to revoke court supervision and recognizance bond until he spent time in jail, retained counsel, and appeared in court with counsel.

¶ 30 William Carol, Spencer Bagwell's attorney, testified to the following. Carol entered his appearance on July 28, 2016, to represent Bagwell on his petition to revoke his court supervision following a DUI. At that time, Bagwell was being held in the county jail. Carol testified that Assistant State's Attorney David Fields "told me first thing that my client was a witness for a matter for the [S]tate and that under no circumstances was [the State] going to *** negotiate anything with me pending that matter and *** I sort of hinted to him that *** was his testimony worth anything and I was told that there would be nothing offered for his testimony."

¶ 31 On cross-examination, Carol indicated that he was unaware that State's Attorney John Hudspeth had conversed with Bagwell on July 27, 2016. On July 28, 2016, Bagwell was not sentenced to additional fines and fees or jail time but was released on his own recognizance bond. On redirect examination, Carol indicated that Bagwell's driving privileges had been revoked, his original fines and fees reimposed, and the State objected to court supervision.

¶ 32 Next, Fields testified to the following. Fields prosecuted Bagwell's DUI charge and the subsequent petitions for violating court supervision. While in custody, defendant retained Carol as legal counsel following a third petition for violation of adult court supervision. On July 28, 2016, Bagwell's case was not set for hearing, but Carol appeared before the court requesting Bagwell's release. The State objected "based on a variety of factors," including Bagwell's failure to appear in court on several occasions, that Bagwell was in custody, that a discussion on the disposition of his case had not taken place, and

13

that Fields "was aware that [Bagwell] was a pending witness in the *** Blair case and there was no agreement at that time."

¶ 33 Fields indicated that Carol's "ultimate goal" was to avoid a judgment of conviction against Bagwell's driving record and to leave Bagwell on court supervision for the DUI. The following colloquy took place:

> "Q. Was any kind of deal struck between the people and Mr. Bagwell for his testimony in the Blair case?
> A. Mr. Carol and I never discussed his testimony. Never discussed the Blair case."

Ultimately, Bagwell's court supervision was revoked and a judgment of conviction for the DUI was entered on September 7, 2016. Fields also indicated that Hudspeth never informed him about a conversation with Bagwell on July 27, 2016.

¶ 34 Following trial, defendant was convicted on all counts. Subsequently, defendant filed timely motions for a new trial and judgment notwithstanding the verdict (*n.o.v.*). The circuit court held a hearing on October 6, 2016, focused primarily on the July 27, 2016, interaction between Hudspeth and Bagwell. Specifically, attorney Tim Huyett testified that Bagwell was in court regarding bond on a petition to revoke a DUI case when he witnessed Hudspeth walk over to Bagwell, put his hand on his shoulder, and assure Bagwell that "it will be okay." Although Huyett thought this interaction was unusual, given his long history with Hudspeth, Huyett stated that "[w]hat [Hudspeth] meant by that, I want everybody to understand I don't know."

¶ 35 Attorney Justin Whitton testified to the following. Whitton initially represented Bagwell on a petition to revoke his supervision in a DUI case. Hudspeth contacted

14

Whitton via phone to inform him that Bagwell would testify in another pending criminal matter in Clinton County. Whitton did not object and "there was no bargain struck at that time." In fact, Whitton stated that "a disclaimer [existed that] there was no offer being made on the pending case for Mr. Bagwell." In his mind, defendant's case and Bagwell's case were two unrelated cases.

¶ 36    Next, Carol testified to the following. Carol stated that his initial goal in representing Bagwell was to have him released from jail and to retain his license. Carol believed Hudspeth's office "wasn't very lenient about" extending Bagwell's supervision because "under no circumstances" was the State "going to agree to anything or negotiate anything with me pending that matter." Carol was told "there would be nothing offered for Bagwell's testimony." On cross-examination, Carol stated that, although additional jail time, fines, and costs were not imposed, a conviction had been entered against Bagwell. On redirect, Carol indicated that Bagwell's driver's license was revoked, which was a more substantial step against driving privileges than a suspension, and the State had objected to Bagwell's release on his own recognizance bond and the continuation of court supervision. Following the hearing on the matter, the circuit court denied defendant's motions for a new trial and judgment *n.o.v.*

¶ 37    In case number 15-CF-61, the circuit court sentenced defendant to three years in prison for count I and four years in prison for count II. In case number 15-CF-91, the court sentenced defendant to 35 years in prison (15 years for the underlying felony of armed robbery plus 20 years for the firearm enhancement) for count I and 15 years in prison to run concurrently for count II. The court also imposed 10-year sentences for

counts III and V and determined that counts IV, VI, and VII in case number 15-CF-91 had merged. Defendant filed a timely notice of appeal.

¶ 38                                    II. Analysis

¶ 39                                    A. Joinder

¶ 40    On appeal, defendant asserts that the circuit court abused its discretion in joining the charged offenses in 15-CF-61 (*i.e.*, drug offenses) and 15-CF-91 (*i.e.*, armed robbery and aggravated battery related offenses) for trial where the charges involved distinct and separate acts not part of the same comprehensive transaction. Accordingly, defendant argues that he was denied a fair trial. In response, the State argues that the court did not abuse its discretion because the factors establish both cases were part of the same comprehensive transaction, and defendant was not prejudiced as a result of joinder.

¶ 41    A court may order two or more charges to be tried together "if the offenses *** could have been joined in a single charge." 725 ILCS 5/114-7 (West 2014). "Two or more offenses may be charged in the same [charging instrument] in a separate count for each offense if the offenses charged *** are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." *Id.* § 111-4(a). The decision to consolidate separately charged offenses for a single trial rests within the sound discretion of the circuit court. *People v. White*, 129 Ill. App. 3d 308, 315 (1984). A court abuses its discretion only where no reasonable person would agree with the court's ruling. *People v. Barner*, 374 Ill. App. 3d 963, 970 (2007).

¶ 42    In exercising its discretion, a circuit court considers several factors when determining whether charges are part of the same comprehensive transaction. *People v.*

16

*Johnson*, 2013 IL App (2d) 110535, ¶ 47. Specifically, a court considers the following four factors: "(1) the proximity in time and location of the offenses; (2) the identity of evidence needed to demonstrate a link between the offenses; (3) whether there was a common method in the offenses; and (4) whether the same or similar evidence would establish the elements of the offenses." (Internal quotation marks omitted.) *People v. Walston*, 386 Ill. App. 3d 598, 601 (2008) (quoting *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996)).

¶ 43 The first two factors are considered the most important when deciding whether offenses are part of the same comprehensive transaction. *People v. Quiroz*, 257 Ill. App. 3d 576, 586 (1993). If it appears the defendant may be prejudiced by a joinder of related prosecutions, the court may deny the request for joinder. 725 ILCS 5/111-8(a) (West 2014); see *Walston*, 386 Ill. App. 3d at 601 (citing *People v. Patterson*, 245 Ill. App. 3d 586, 587 (1993) (describing statutory scheme)). " 'A defendant is not prejudiced by the improper joinder of charges if, had separate trials been given, defendant still would have been convicted.' " *People v. Wayman*, 379 Ill. App. 3d 1043, 1063 (2008) (quoting *People v. Gonzalez*, 339 Ill. App. 3d 914, 922 (2003)).

¶ 44 "The first factor, probably the most helpful by far, asks whether the offenses to be joined were close in time and location." *Walston*, 386 Ill. App. 3d at 603. "This factor makes sense, because, as events become separated by time and distance, the likelihood decreases that they may be considered part of the same comprehensive transaction as is required by the statute." *Id.* Moreover, the committee comments to section 111-4 of the Illinois criminal code indicates that the " 'same comprehensive transaction' " test for

joinder of multiple offenses was "meant to allow prosecutors to use one indictment to charge multiple offenses based on a single act." *Id.* (" 'If separate offenses appear in a single count, the indictment is subject to a charge of duplicity. *** If a single act causes several offenses, they should be joined in one indictment by separate counts unless the court orders otherwise.' " (quoting 725 ILCS Ann. 5/111-4, Committee Comments-1963, at 653 (Smith-Hurd 2006))).

¶ 45 Here, defendant was found guilty of multiple violent offenses while armed with a firearm. After firing several shots with his gun, one which hit and injured Ryan, defendant fled in his vehicle and was seen driving at a high speed through a subdivision west of Trenton, Illinois, on the morning of April 25, 2015. Hours later, defendant's disabled vehicle was discovered by police near Shady's Bar in Summerfield, Illinois. Shortly thereafter, Officer Weh observed defendant south of Shady's Bar after Jacob, defendant's friend, informed Officer Weh that defendant had requested him to fix his flat tire. Defendant's vehicle was later towed to JDS Towing where police discovered four bags of cannabis and two pills of oxycodone.

¶ 46 Both the drug-related and armed robbery and aggravated battery related offenses occurred on the morning of April 25, 2015. In terms of proximity of location, defendant's disabled vehicle was discovered approximately nine miles from the home he robbed that morning. Although the record indicates that the offenses were close in time, the evidence does not support proximity of location or that the offenses were committed as part of a common scheme. See *People v. Marts*, 266 Ill. App. 3d 531, 543 (1994). In fact, the only similarity among the offenses was that defendant committed the offenses within hours of

18

each other on the same day. However, the offenses clearly occurred at different locations. Accordingly, because the offenses did not occur within a close space to one another, the first factor is not met.

¶ 47 The second factor, common evidence, "asks not whether evidence of the two crimes is similar or *identical* but rather whether the court can *identify* evidence linking the crimes." (Emphases in original.) *Walston*, 386 Ill. App. 3d at 605 (citing *People v. Duncan*, 115 Ill. 2d 429, 442 (1987)). If evidence links the two crimes, then, by definition, it will be identical for both crimes. *Id.* at 606.

¶ 48 Here, the object of the drug-related offenses included four bags of cannabis and two pills of oxycodone that were discovered in defendant's disabled vehicle after it was towed. The armed robbery and aggravated battery related offenses involved the taking of cash and a pair of designer jeans from Ryan. Aside from a large sum of money found on defendant, which alerted Sergeant Markus that defendant likely sold drugs, and the fact that witness testimony indicated defendant demanded "Tippy's money," there was no evidence linking the crimes. First, there is no evidence that the discovered cannabis or oxycodone was taken from the victims during the armed robbery. Moreover, the hitter box Ryan gave defendant was not discovered in defendant's vehicle. Furthermore, Ryan's designer jeans that defendant took were never recovered, and defendant's clothing, specifically gloves and a dark-colored shirt, were never discovered in defendant's vehicle when it was towed.

¶ 49 The third factor, common method, asks "whether the offenses were part of a 'common scheme,' so that each of the offenses supplies a piece of a larger criminal

endeavor." *Walston*, 386 Ill. App. 3d at 606-07. In *Quiroz*, 257 Ill. App. 3d at 586, evidence was offered linking two shootings to the defendant's alleged armed robbery when the defendant attempted to enter the home of an acquaintance as he fled the scene of the shootings. This evidence helped show that all three crimes were part of a common criminal scheme and motive by framing the defendant's theft of the car as a continuation of his attempts to flee the scene of the two shootings. *Id.* As such, the court in *Quiroz* determined that the defendant's intervening attempt to hide in a house linked his crimes of shooting two people and stealing a car to escape. *Id.* We find *Quiroz* distinguishable to the instant case.

¶ 50 Here, there does not appear to be a common motive linking together the drug-related and armed robbery and aggravated battery related offenses. Rather, the only visible thread of continuity between the offenses is that defendant was seen driving at a high speed through a subdivision on the morning of April 25, 2015, and that his vehicle was later found disabled at Shady's Bar, approximately nine miles from the victims' home. Such an incidental connection cannot satisfy the plain meaning of the present statutory requirement that the separate offenses charged in a single indictment should arise out of the same " 'comprehensive transaction.' " See *People v. Fleming*, 121 Ill. App. 2d 97, 103 (1970). Lastly, the fourth factor, whether similar evidence would establish the elements of the offenses, does not support joinder in this case.

¶ 51 Although the factors do not weigh in favor of joinder in the instant case, a defendant is not prejudiced by improper joinder of charges if, had separate trials been given, the defendant would have been convicted. *Wayman*, 379 Ill. App. 3d at 1063;

20

*People v. Gonzalez*, 339 Ill. App. 3d 914, 922 (2003); *Patterson*, 245 Ill. App. 3d 586. Here, we find there is no reasonable probability that the outcome of the cases would have been different if separate trials would have been ordered. The evidence of defendant's guilt in relation to the drug charges was overwhelming where the cannabis and oxycodone pills were discovered in defendant's vehicle. Witness testimony established that defendant drove the vehicle shortly before it was discovered by law enforcement and, upon his arrest, defendant was found with large sums of money in his pockets and wallet. Moreover, according to Sergeant Markus, the cannabis was not for defendant's personal use but intended for sale.

¶ 52    Likewise, the evidence against defendant on the armed robbery and aggravated battery related offenses was overwhelming. Had the armed robbery and aggravated battery related offenses been tried separately, witness testimony by all of the victims would have demonstrated that defendant had been identified as the shooter based on his build, voice, and physical appearance. Moreover, the record indicates that defendant referenced a "fake camera," which only the roommates and two or three people, including defendant, knew about. Based on the evidence, there is no reasonable probability that defendant would have been acquitted of the charges based on the evidence against him. Accordingly, defendant was not prejudiced by the joinder of charges against him.

¶ 53                    B. Ineffective Assistance of Counsel

¶ 54    Briefly, we note that defendant initially argued ineffective assistance of counsel on appeal, but he abandoned this argument in his reply brief. As such, we will not address this issue.

¶ 55                         C. *Brady* Violations

¶ 56    Lastly, defendant asserts that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it withheld evidence that Bagwell would receive leniency in the resolution of his own case in exchange for his damning testimony in defendant's case. Defendant maintains that Bagwell testified falsely when he stated that no discussions had taken place concerning his cooperation in defendant's case when evidence demonstrated that Hudspeth had put his hand on Bagwell's shoulder and stated to him that "it will be okay." This conversation, according to defendant, demonstrates a promise of leniency was offered in exchange for Bagwell's testimony. As a result, Bagwell avoided additional jail time in his own case following the conclusion of defendant's trial.

¶ 57    In 1963, the United States Supreme Court held that the State has an affirmative duty to disclose evidence favorable to a defendant in criminal prosecutions. *Maryland*, 373 U.S. at 83. Thirteen years later, in *United States v. Agurs*, 427 U.S. 97, 103 (1976), the Court set forth "three quite different situations" to which the general rule of *Brady* and varying tests of materiality apply to determine whether a criminal conviction must be overturned. The first situation occurs when the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury. *Agurs*, 427 U.S. at 103. In such a case, the conviction must be set aside if there is any reasonable

22

likelihood that the false testimony could have affected judgment of the jury and a "strict standard of materiality" is imposed. *Id.*

¶ 58 The second situation occurs when the prosecution suppresses evidence favorable to the defendant after a pretrial request for specific evidence. *Id.* at 104. If the suppressed evidence is material, in that it might have affected the outcome of the trial, the conviction must be reversed. *Id.* The Supreme Court did not define the standard of materiality applicable to this situation, but the Court noted that "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Id.* at 106.

¶ 59 The final situation occurs when the defense makes either no request for evidence or only a general request for *Brady* material, and exculpatory matter is withheld by the prosecution. *Id.* at 107. When this situation occurs, the standard of materiality is more favorable to the State. *Id.* The defendant will be entitled to a new trial only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt that otherwise would not exist. *Id.* at 112.

¶ 60 To establish a *Brady* violation, suppressed evidence must be both favorable to the accused and material. *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). Favorable evidence is material in this context " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A " 'reasonably probability' " of a different result is a " 'probability sufficient to undermine confidence in the outcome.' " *Id.* at 433 (quoting *Bagley*, 473 U.S. at 682). Materiality is

demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

¶ 61 Defendant maintains the first two situations are in play in the instant case. Applying the foregoing principles to the instant case, we cannot conclude that defendant is entitled to a new trial under the first situation in *Agurs* where the record does not support defendant's contention that Bagwell's testimony was false and that the prosecution knew, or should have known, of any perjured statements. Instead, in conjunction with Bagwell's testimony that he was not promised leniency for his damning testimony, Carol, Bagwell's attorney, and Fields, the prosecuting attorney in Bagwell's case, both testified that no such negotiation took place. In fact, Fields testified that "Mr. Carol and I never discussed [Bagwell's] testimony. Never discussed the Blair case." Because the record does not support defendant's contention that Bagwell's testimony was false and that the prosecution knew, or should have known, of any perjured statements, he has failed to establish a *Brady* violation.

¶ 62 Next, we cannot conclude that defendant is entitled to a new trial under the second situation in *Agurs*. Defendant asserts a *Brady* violation occurred because defendant filed motions to discover in both cases seeking information that would tend to negate defendant's guilt " 'including but not limited to prior inconsistent statements or conduct and *** any and all consideration or promises of consideration given to or made on behalf of government witnesses.' " As such, defendant contends that the State's failure to disclose Hudspeth's conversation with Bagwell, together with the failure to disclose

24

Fields' conversation with Carol, significantly curtailed this line of questioning, and "a different outcome *might* have occurred." (Emphasis in original.) We disagree.

¶ 63    We cannot conclude that a hand on an individual's shoulder coupled with the statement, "it will be okay," was favorable evidence that could have reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Rather, the record supports the conclusion that a negotiation or promise of leniency did not occur where Bagwell testified that he never received any promises of leniency to testify in defendant's case, and Fields' conversation with Carol reiterated the State's firm decision not to enter into an agreement for Bagwell's testimony. Accordingly, we cannot agree with defendant that, had the above conversations been disclosed to the defense, there is a reasonable probability the result of the proceeding would have been different. Thus, defendant has failed to establish a *Brady* violation.

¶ 64                                III. Conclusion

¶ 65    For the foregoing reasons, the judgment of the circuit court of Clinton County is affirmed where joinder was proper, given there was no reasonable probability that defendant would have been acquitted of the charges against him had separate trials been ordered, and he is not entitled to a new trial where he failed to carry his burden to establish a *Brady* violation.

¶ 66    Affirmed.