THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY KARRAKER, Defendant-Appellant.

Third District    No. 3—92—0402

Opinion filed April 5, 1994.

Larry R. Wells, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Clarke Erickson, State's Attorney, of Kankakee (John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

Following a jury trial, the defendant, Jerry Karraker, was found guilty of unlawful possession of a weapon by a felon (720 ILCS 5/24—1.1(a) (West 1992)), unlawful use of a weapon, in that he manufactured a machine gun (720 ILCS 5/24—1(a)(7) (West 1992)), and theft (720 ILCS 5/16—1(a)(4) (West 1992)). The transcript of the sentencing hearing shows the trial court sentenced the defendant to two years' imprisonment on the unlawful possession charge and three years' imprisonment on the unlawful use charge. The docket entry also shows the court sentenced the defendant to two years in prison on the theft charge. The defendant appeals. We reverse and remand.

A grand jury returned a three-count indictment against the defendant, following a six-month investigation in which the defendant's conversations with a government informant were taped. The government informant, Russell Vining, had known the defendant for

over 10 years. The record indicates the defendant had recently bought a car from Vining and owed Vining $2,600. The record shows Vining was cooperating with law enforcement officials, in particular the Illinois State Police, because he had at least one criminal charge pending against him at the time.

Vining testified that on April 18, 1991, he was at the Redwood Inn in Kankakee for lunch. The defendant also happened to be there in the lunch line. They struck up a conversation in which the defendant told Vining that he had a "Wildey" gun which he wanted to sell for $1,500. Vining told the defendant he had a better gun than that in his car. Vining testified that although they sat at separate tables to eat lunch, they were still within five or so feet of each other and their conversation continued. Vining testified he told the defendant that he wanted a MAC-11 handgun and the defendant told him he would help him get one. Immediately after this conversation, Vining telephoned Jeff Justice of the Illinois State Police and told Justice about the conversation with the defendant. According to Vining, he had been instructed by Justice to report anything which was not legal in order to "[m]ake amends for what [he] had done."

In late April 1991, the defendant, who operated a concrete business, was seriously injured when he was crushed by a heavy piece of the machinery. He was hospitalized until the first week in June. After his release from the hospital, the defendant and his wife, Penny Karraker, stayed at the home of his mother, Helen Karraker, so that Helen could help Penny take care of him.

On June 6, 1991, Vining visited the defendant, at Helen's home. On his person he carried a device which allowed the State Police to overhear and tape the conversation. The tape of this conversation and 10 other conversations which took place from June 1991 through October of 1991 were played to the jury in their entirety. In addition, the jury was given transcripts of the conversations to read along with while the tapes were played. (Vining testified he had no nonrecorded conversations with the defendant during this period of time.) Defense counsel raised no objection, even though the taped conversations included an enormous amount of totally irrelevant and highly prejudicial statements by the defendant.

On the tape of the June 6, 1991, conversation, after talking about a number of subjects, Vining asked the defendant whether he had found him a gun. The defendant stated he had not had a chance, then stated he found a "Mack [*sic*]" for $380. Thereafter the following conversation took place:

"[Vining:] *** Is that like the one Randy had?

[Karraker:] It ain't got—It ain't got no pipe on the end of it.

[Vining:] Huh. Can you get me one?

[Karraker:] That I don't know.

[Vining:] Well, that'd be no fun without that.

[Karraker:] Ehh—You—that's real easy to convert. You can take that son of a bitch apart, there's a little spring in there, you take your finger, scoot that son of a bitch over, (unintelligible) want to change it back to semi, make it legal, (unintelligible).

[Vining:] Would you—switch it for me?

[Karraker:] Oh, I can show you how to do it, hell there's about ten ways to change them.

[Vining:] What would that run me?

[Karraker:] I don't really know. I—I figure somewhere around four and a half (unintelligible), for the gun."

The defendant then discussed how to build a silencer and how he had built a silencer for another person about three years before. Vining asked the defendant why he didn't go into the business of producing silencers. The defendant stated it was not worth the risk of getting caught. Following further conversation about silencers and getting a license in Indiana for an automatic weapon, Vining again asked the defendant if he would convert a gun for him. The defendant stated he would show Vining how to do it. Vining continued to press the defendant to get him a gun and convert it into an automatic weapon, asking him a number of times to do it for him. The defendant promised to find out what price the "guy" was asking for the gun.

After further discussion of guns, Vining asked the defendant if he had sold the handgun he was asking $1,500 for. The defendant asked Vining if he wanted to see the gun. From the tape, it appears the defendant got up and left the room. After a period of time, Vining is heard to ask whether he should carry it. The defendant responded, "Take one end." The gun case was then opened and Vining inspected the gun.

The defendant and his wife testified at trial that she retrieved the gun from under the couch in the room where the two men were talking and that she handed the gun case to Vining. The defendant and his wife further testified that she was the owner of the gun, and that the gun was kept at Helen Karraker's home because they did not want to have guns in their home, because the defendant had gun charges pending in Federal court, and he was also a convicted felon.

On the tape the defendant told Vining he was not going to do anything with the gun, while charges were pending against him in Federal court. The discussion then turned to other unrelated matters, including the corruption of Kankakee area law enforcement

personnel (bribery in a murder trial), a threat he made to a police officer at the Kankakee courthouse, how he tried to bribe two police officers to kill a black man who raped his wife, and how he shot a hunter in the head. The defendant also told Vining about members of a Chicago street gang who beat up a man who had stolen guns from the defendant. The defendant spoke at length about his plans to have his motorcycle stolen so he could collect the insurance money. At the conclusion of the conversation, Vining again asked the defendant to get him the gun and convert it to automatic for him. The defendant agreed to show him how to convert it so that Vining could convert it back and forth.

This conversation and the apparent handling of the "Wildey" during the conversation served as the basis for the unlawful-possession-of-a-weapon-by-a-felon charge.

The jury also heard the tape-recording of two telephone conversations between Vining and the defendant which took place on June 11, 1991, and July 1, 1991. On June 11, 1991, Vining telephoned the defendant and asked about the gun. The defendant explained that the man selling the gun was on a fishing trip for two weeks and that he would call the defendant when he got back. Vining then suggested they do something with the defendant's motorcycle. Vining called the defendant on July 1, 1991, asking about the gun. The defendant indicated that the man was no longer interested in selling the gun. Vining told the defendant to offer the man more money. Vining again asked the defendant if he had done anything with his motorcycle.

Two and a half months later, on September 12, 1991, Vining went to the defendant's home. The conversation took place in the defendant's driveway, while the defendant and Vining sat in Vining's car. During the taped conversation, Vining raised the subject of the gun. The defendant told Vining he had not seen or talked with the seller. The conversation then moved to various unrelated matters. For example, the defendant told Vining how he threatened to burn down his black neighbor's house with his neighbor in it. On the tape, the defendant is heard to refer to his neighbor as "that jiggerloo mother fucker," and his neighbor's wife as "one of them fuckin radical nigger bitches." When asked by Vining if he would "burn somebody up," the defendant responded, "Not me. That's illegal. Didn't you know that, you mother fucker." The statement is followed by laughter.

Vining asked about the Wildey gun and whether the defendant was ready to sell it. He also intimated he would take the gun in exchange for forgiving part of the debt the defendant owed him. The defendant stated he was waiting to see what happened with the Federal charges.

The defendant and Vining then discussed a number of other things, including the fact that the defendant was offered a bribe by a Kankakee police officer and the State's Attorney. The defendant told Vining that the police officer put the offer in writing and that he still had it in his possession. (The record shows some type of written document was seized from the defendant's home on the day he was arrested. By agreement the document was later turned over to authorities for further investigation.)

During the conversation, Vining again asked the defendant about getting him a gun or selling the Wildey. The defendant indicated he was not doing anything until after the Federal case was behind him. He stated he would call about getting a Mac. The discussion then turned to possible ways of staging the theft of the defendant's motorcycle.

Subsequently, Vining said to the defendant, "I'm getting zero from ya. I can't get a bike, I can't get a gun, I can't get my little *** my other li—little automatic I want." The defendant responded he had to wait to "get done with them fuckin Feds *** then talk to me boy." Vining told the defendant he did not want anyone to know he was getting the gun. Vining indicated that he lost "one." The defendant asked him if he lost the gun the defendant sold to Randy Huffman. Vining stated it was stolen from Vining's car and that he had to replace it. The defendant noted that the weapon that Huffman had was semi-automatic and that he had switched it back to semi-automatic himself. Vining insisted that he wanted a fully automatic weapon and pressed the defendant for how much he would charge to do the conversion. The defendant did not state a price, saying that changing it only took about five minutes. The defendant expressed reservations about doing anything because he was facing 20 years in Federal prison. The defendant stated he wanted to wait until after the Federal case was over.

The defendant then changed the subject and asked Vining if he wanted to see something he bought. He stated he was going to "move it" the next day. The defendant then went into his house and returned with a case containing camera equipment. Vining asked the defendant where he got the equipment. The defendant stated, "They—they kinda got borrowed. *** I borrowed 'em." The defendant told Vining the equipment was worth $2,400, and that he was going to sell it for $900.

The defendant told Vining the equipment belonged to a professional photographer from Chicago and that the photographer had the equipment stolen out of his car. According to the defendant, he thought the man reported it stolen out of his home in Chicago.

However, the defendant also stated he had someone check, and they told him the equipment was never reported stolen.

The conversation then turned back to the gun, with the defendant promising to talk to someone during the coming weekend about getting a gun. The defendant explained why he was facing Federal gun charges. The defendant also told Vining how he stabbed a couple of people, and that he had hit various people with claw hammers, ball bats and a golf club.

Over defense counsel's objection, the trial court admitted a gun and silencer which had been recovered in the possession of Randy Huffman. The State contended this was the gun and silencer Vining told the defendant was stolen out of his car. The prosecutor admitted it was a "concocted State Police story." However, he argued the gun evidence went to the credibility of Vining's testimony. Vining testified that the last time he saw the gun it was in the possession of Jerry Alexander. He agreed that he had also seen the gun in Randy Huffman's possession at one time.

On September 19, 1991, Vining spoke twice on the telephone with the defendant. The defendant told Vining he had not heard anything about the gun he was trying to get for him. The defendant told Vining he knew of a woman who was selling a gun. Vining asked if the defendant could convert it and the defendant said, "Yeah, yeah. It's the same thing. *** Oh they can all be converted." Vining told the defendant, "I gotta make good on this." Vining told the defendant he borrowed the gun and lost it. The defendant stated he would try and contact the two people about the guns.

Vining then asked the defendant about the camera equipment and the defendant told him he had not heard "nothin yet." Vining told the defendant he had some "running around to do" and he would call the defendant back.

Two hours later, Vining called the defendant. The defendant told Vining he had spoken with the woman and it appeared she was ready to sell her gun. She was going to call him the next Monday. Vining asked the defendant to pick up the gun and convert it for him. The defendant suggested that Vining pick up the gun himself and afterwards they could meet to convert it to fully automatic. Vining again asked the defendant to go over and pick up the gun. The defendant said he guessed he could do that, but he hated to have a gun in his possession.

On September 23, 1991, Vining called the defendant. The defendant told Vining the woman had decided to keep the gun. He also indicated that the other person he was trying to reach had decided not to sell his gun. The defendant suggested that Vining look in trade magazines and that he go to a legitimate gun dealer.

On October 7, 1991, Vining telephoned the defendant to tell him he had a "present" he wanted to bring over to the defendant's home. The defendant suggested he come over after dark. Vining asked the defendant how long it would take. The defendant said he would have to look at it and that "it shouldn't take very long." The "present" was a gun supplied by the State Police, which had previously been tested and shown to be a semi-automatic.

At around 8 p.m., on October 8, 1991, Vining went to the defendant's home with the gun. On looking at the gun, the defendant told Vining this was not like the other gun and that he had never "fucked with one of these mother fuckers." He told Vining he had never taken apart a gun like this before. With difficulty the defendant got the gun open and worked on the gun's mechanism with a butter knife, saying a number of times that the gun was different. The defendant stated that converting a gun was illegal. After he worked on it, the defendant told Vining he was going to have to grind down a part of the mechanism before it would be usable as a fully automatic. He told Vining it was now a fully automatic; however, the way the mechanism was set up, a person would not be able to both hold it and fire it as an automatic. Part of the mechanism had to be ground down. The defendant stated that Vining could do grinding himself.

Vining suggested that they go to his shop and do the grinding. The defendant explained to Vining what to do. However, Vining insisted that the defendant do it. After further coaxing in which Vining said to the defendant, "Come on Dad take care of me," the defendant agreed to go to the shop with Vining. On the drive to Vining's shop, Vining asked the defendant about the camera equipment. The defendant told Vining that the man he was going to sell them to could not come up with the money. Vining offered to try and find a buyer for the equipment.

When they got to the shop, the defendant did the grinding and gave the gun back to Vining. Vining then dropped the defendant back off at his home, then met with State Police officials and turned the gun over to them. At trial, the State's expert witness stated he had tested the gun and that it was now fully automatic.

On October 14, 1991, Vining telephoned the defendant and they talked about the type of ammunition to use in the gun the defendant had converted. During the conversation, Vining asked the defendant if he still had the camera equipment. Vining told the defendant he could sell the equipment for him. Vining also brought up the Wildey gun. Vining told the defendant he would give him a call about the camera equipment.

On October 16, 1991, Vining went to the defendant's home and asked about the camera equipment. Vining told the defendant he wanted to take the camera equipment and show the prospective buyer. Vining and the defendant went to a nearby storage building where the defendant retrieved the case containing the camera equipment. The defendant told Vining he had a friend run the serial numbers on the camera equipment and they were not reported stolen.

As an aside, the defendant mentioned to Vining that he had to go to court the next day for a friend. The defendant and Vining talked about various local judges. At one point the defendant is heard on the tape to say, "[O]h that little short Gould. That's a *** fucker. Danny. *** I'm gonna—boy if I ever meet him on the fuckin road, I'm gonna run and put four tire tracks up that prick's fuckin ass. Him I—boy I just as soon see somebody that I can kill."

Thereafter, the defendant and Vining continued discussing the camera equipment then talked about a number of subjects, including the defendant's previous problems with possession of allegedly stolen property, plea bargaining in his Federal case and being pursued by authorities for poaching. Vining asked leading questions in a attempt to elicit details and comments. Later in the conversation, the defendant described how he had been watching Judge Gould jog and that he knew the judge's routine. The defendant stated that he did not want to see Gould dead, but "hurt bad." The defendant stated that he planned to lie in wait along the route Gould jogged, and that he was going to "just lay him out flat with [sic] fuckin baseball bat."

At the conclusion of the conversation, Vining took the camera equipment and later turned the equipment over to the State Police. The next evening Vining telephoned the defendant and told him he had sold the equipment. He asked the defendant to meet at his shop early the next morning. The defendant was apparently arrested when he showed up the next morning. The defendant's home and that of his mother were also searched that day. The Wildey gun was recovered under the couch in his mother's living room.

At trial, the defendant's son, Steven Karraker, testified that he managed five Magic Rent to Own stores located in the Chicago south suburbs and Kankakee. He testified that he bought the camera equipment from a man named Jim. Before buying the equipment from the man, Steven testified he spoke with the defendant by phone, because the defendant knew about cameras. Steven testified his father told him what they were worth and that it sounded like "a good buy." He testified he later gave the equipment to the defendant in return for a loan to buy a car.

As indicated above, the defendant was charged in a three-count

indictment alleging unrelated offenses taking place on three separate days. The charges were tried together before a single jury. Defense counsel did not move for a severance of the unrelated charges. Nor did defense counsel object to the playing of the taped conversations in their entirety, although the tapes contained numerous irrelevant and highly prejudicial statements by the defendant. The defendant was found guilty on all three counts.

We reverse and remand the cause, finding, *inter alia*, that it was plain error to both indict and then try the defendant in the same proceeding on three totally unrelated charges. We also find the defendant received ineffective assistance of counsel and that as a result he was denied a fair trial. We also find that the defendant was entrapped as a matter of law into committing a conversion of the semi-automatic weapon, and that the State failed to prove beyond a reasonable doubt that the defendant committed a theft of the camera equipment.

■ Section 111—4(a) of the Code of Criminal Procedure of 1963 provides that two or more offenses may be charged in the same indictment in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on two or more acts which are part of the same comprehensive transaction. (725 ILCS 5/111—4(a) (West 1992).) Therefore, generally, the joinder of criminal offenses in the same indictment is not permitted where the charges are not based on the same act or are not based upon two or more acts which are part of the same transaction. (*People v. Benka* (1983), 117 Ill. App. 3d 221, 453 N.E.2d 71; *People v. Daniels* (1976), 35 Ill. App. 3d 791, 342 N.E.2d 809.) Factors to consider in determining whether offenses are part of the same transaction include: their proximity in time and location, the identity of evidence to be presented, similarities in the acts, and whether there was a common method of operation by the perpetrator. *People v. Lewis* (1992), 240 Ill. App. 3d 463, 609 N.E.2d 673.

Given the three charges contained in the indictment were completely unrelated and not part of the same comprehensive transaction, we find it was plain error to bring these charges in a single indictment and then try those unrelated charges before a single jury. The purpose behind section 111—4(a) is to protect a defendant from the prejudicial effect of a trial on multiple unrelated charges. (*People v. Key* (1975), 28 Ill. App. 3d 637, 328 N.E.2d 914.) In this case, the provisions of section 111—4(a) were violated, the defendant prejudiced thereby and thus denied a fair trial. Thus, the defendant's convictions must be reversed and the cause remanded.

Beyond this, we find defense counsel in this case was ineffective

in failing to move for a severance of the three counts and in failing to object to the presentation to the jury of irrelevant and highly prejudicial material contained on the tape-recorded conversations. Although given our finding that plain error occurred, and therefore we need not address the ineffective assistance claim, we find defense counsel's representation in this case to be so substandard as to warrant addressing the claim on the merits as a basis for reversal.

Under the due process clause of the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV), a criminal defendant in State court has the right to the assistance of counsel as set forth in the sixth amendment. (*Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792.) As a necessary corollary, the right to counsel is the right to effective assistance of counsel. (*McMann v. Richardson* (1970), 397 U.S. 759, 25 L. Ed. 2d 763, 90 S. Ct. 1441.) After a conviction, in order to establish that his counsel was ineffective, a defendant must prove that his counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious that he was deprived of a fair trial—a trial whose results are reliable. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

In *People v. Lewis* (1992), 240 Ill. App. 3d 463, 609 N.E.2d 673, defense counsel was found to be ineffective in failing to move to sever two murder charges. In *Lewis*, the defendant was charged with the murder of two people. The defendant allegedly killed a woman in a downstairs apartment of the building in which the defendant's sister lived. Two days later, the defendant stabbed a man to death in the sister's apartment. The man's body was placed in the dead woman's apartment, where her body had not yet been discovered.

The *Lewis* court found the evidence showed there were different motives for the murders, that the murders occurred at different locations and on different days. The court found that although the victims' bodies were found at the same location and there were common witnesses to the murders, this did not show that the murders were part of the same comprehensive transaction. The court also found it could conceive of no legitimate trial strategy in defense of counsel's failure to move for a severance. The court noted the defendant raised markedly different defenses to the two murders, and that

the court could not underestimate the impact the cumulative evidence of the two murders had on the jury. The court found there was no doubt the defendant was prejudiced by his defense counsel's failure to move for a severance.

■ In the instant case, we find unpersuasive the State's argument that defense counsel's failure to move for severance of the three charges or move to have the taped conversations edited was part of trial counsel's strategy, and in the alternative, if counsel was ineffective, that ineffectiveness did not affect the outcome of the proceedings. Here, the alleged offenses were completely unrelated, they took place days and months apart, and were beyond a doubt not part of the same comprehensive transaction. In addition, the defendant raised totally different defenses to the three charges. He maintained his wife was the legal owner of the Wildey gun and that she handled the gun on June 6, 1991, when the gun was shown to Russell Vining. Second, he contended the camera equipment was legitimately bought by his son and later given to him in return for a car loan. Most strikingly, however, he raised an entrapment defense to the charge in count II that he manufactured a machine gun. Raising this defense necessarily required that he admit to having committed the alleged offense. (See *People v. Gillespie* (1990), 136 Ill. 2d 496, 557 N.E.2d 894.) Defense counsel's failure to recognize the prejudicial impact such an admission would have in the context of the other charges is incomprehensible.

In failing to request a severance of the unrelated charges, trial counsel's representation fell far below any objective standard of reasonableness. Multiple unrelated charges, coupled with an admission of having committed one of the offenses, may well have swayed the jury to convict the defendant for being a bad person, rather than on the merits of the State's proofs.

■ This failure, combined with defense counsel's apparent acquiescence in the playing of the taped conversations in their entirety, so prejudiced the defendant that we find he was denied a fair trial. The tapes were replete with racial and sexual epithets, and covered numerous unrelated subject matters, often involving criminal behavior with which he was not charged. For example, he discussed his plans to attack a circuit court judge with a ball bat and to stage the theft of his motorcycle to collect the insurance proceeds. He also talked about his numerous confrontations with law enforcement, his pending Federal gun case, and how he planned to declare bankruptcy to avoid paying his medical bills. During one conversation, the defendant told Vining that invoking the fifth amendment would get one into trouble and wouldn't "cut it" in front of a jury, and that the best thing to do was say, "I just don't remember."

Again, large portions of the tapes contained matters totally irrelevant to the charges against the defendant and served no conceivable defense purpose. The irrelevant portions were highly prejudicial and showed nothing other than the defendant was a person of low moral and ethical character. In sum, we find the defendant received ineffective assistance of counsel which so prejudiced the defendant as to deny him a fair trial.

In addition, beyond finding the defendant was denied a fair trial, we find the defendant's convictions on counts II and III must be reversed outright.

The defendant contends the evidence shows he was entrapped as a matter of law into converting the semi-automatic handgun into a fully automatic machine gun. We agree.

The entrapment defense involves two primary factors, *i.e.*, (1) whether the defendant was influenced or induced to commit the offense by government officials or someone working with the government, and (2) whether the defendant was predisposed to commit the offense involved. (*People v. Martin* (1984), 124 Ill. App. 3d 590, 464 N.E.2d 837.) It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution; however, in their zeal to enforce the law, government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the government may prosecute. (*Jacobson v. United States* (1992), 503 U.S. ___, 118 L. Ed. 2d 174, 112 S. Ct. 1535.) Where law enforcement officials have induced an individual to break the law and the defense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by the government agent. *Jacobson v. United States* (1992), 503 U.S. ___, 118 L. Ed. 2d 174, 112 S. Ct. 1535.

■ In the instant case, the defendant was charged with manufacturing a machine gun by converting a semi-automatic handgun into a fully automatic weapon. The State failed to prove that the defendant was predisposed to commit this crime prior to his being approached by the government agent. On April 18, 1991, when the defendant and Vining spoke at the Redwood Inn, Vining was already acting as a government agent. He had been instructed by State Police Officer Justice to report any illegal activity. Vining was doing this because he was in some type of trouble for criminal activity. The record is very unclear as to exactly what charges he was facing. In any event, he clearly had a motive to induce the defendant into crim-

inal activity. Also, the record shows that the defendant owed Vining $2,600 for a car he had purchased from Vining. Thus, he was indebted to a person who the record shows had a propensity toward violence, and, therefore, he was more likely to cooperate with him.

During the April 18, 1991, conversation, the defendant mentioned that he had a gun which he was interested in selling. Since the defendant had a felony conviction, this was illegal. Vining told the defendant he was interested in getting a gun. According to Vining, the defendant offered to help him. There was no mention of converting guns into machine guns.

During the next recorded conversation on June 6, 1991, Vining expressed disappointment that the gun the defendant had located did not have a silencer. Whereupon, the defendant mentioned that the weapon could be converted to a fully automatic weapon. Vining asked the defendant if he would convert it. The defendant stated that he would show him how to do it.

Some four months passed, and the defendant failed to get Vining a gun. Eventually, the State Police provided a weapon, which Vining asked the defendant to convert. He took the weapon to the defendant's home and after some coaxing, he took the defendant to his shop to complete the conversion.

We find the State presented no pertinent evidence that the defendant was predisposed to convert weapons prior to his first contact with Vining. The fact that he may have converted weapons at some previous unspecified time is insufficient to show a predisposition on April 18, 1991, to commit the crime charged. (See *Sherman v. United States* (1958), 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819.) Even at the second conversation on June 6, 1991, the defendant's comment that the weapon he was trying to get for Vining could be easily converted started out as just that, a comment in response to Vining's disappointment about the lack of a silencer. Thereafter, Vining asked the defendant numerous times to do the conversion for him. Eventually, the State had to supply a gun because the defendant failed to follow-up on his promise to Vining.

The record illustrates that the State could not get the defendant to commit one crime, so it eventually settled for entrapping him into committing another. During the entire period from April to October, the defendant did not initiate a single contact with Vining. At first, Vining attempted only to get the defendant to buy a gun for him, an act which was illegal in light of the defendant's previous felony conviction. The conversion aspect arose later, through a passing remark made by the defendant. The record shows the State spent an inordinate amount of time, money and energy in an attempt to catch

the defendant in relatively minor criminal acts. As Justice Frankfurter once said, "No matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society." *Sherman v. United States* (1958), 356 U.S. 369, 383, 2 L. Ed. 2d 848, 857, 78 S. Ct. 819, 826 (Frankfurter, J. concurring, joined by Douglas, Harlan and Brennan, JJ.).

In sum, the State did not prove beyond a reasonable doubt that the defendant had an independent predisposition to commit the crime he was charged with at the time he began dealing with the government agent. Nor did it prove that the conversion crime was not the product of continuing pressure from the government agent. Thus, the State failed as matter of law, to present evidence to support the jury's verdict.

We also agree that the State failed to prove the defendant was guilty of the theft of the camera equipment. The defendant was charged with violating section 16—1(a)(4) of the Criminal Code of 1961, which provides, "A person commits theft when he knowingly: *** (4) Obtains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce him to believe that the property was stolen, and (A) Intends to deprive the owner permanently of the use or benefit of the property; or (B) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or (C) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit ***." 720 ILCS 5/16—1(a)(4) (West 1992).

The defendant contends the State failed to prove all the elements of the offense when it failed to prove the true owner of the equipment. The State counters that the defendant was charged "with theft of stolen property rather than straight theft," and that it therefore did not have to establish the identity of the owner. The State argues subsection (4) of the theft statute requires merely that the State establish that the property was stolen. The State concedes it could find no cases directly on point to support its contention.

In the instant case, the only evidence that the property was stolen is the defendant's intimations during the taped conversations that the property was stolen. There was no other independent evidence presented to corroborate the words of the defendant.

■ Subsection (4) requires that the defendant in some way act to permanently deprive the *owner* of the use or benefit of property which

has been stolen. Proof that one other than the accused either owns or has a superior possessory interest in the property allegedly stolen is an essential element of the offense of theft. (*People v. Cowan* (1977), 49 Ill. App. 3d 367, 364 N.E.2d 362.) Proving that there was in fact an actual owner or person who had a superior possessory interest in the camera equipment was essential to proving the defendant guilty of theft. Without proof of an identified "owner," there is no real proof the property was stolen.The defendant's words standing alone are insufficient to support a conviction.

For the foregoing reasons, we reverse the judgment of the circuit court of Kankakee County on counts II and III outright, and reverse the judgment on count I and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded.

McCUSKEY and BARRY, JJ., concur.