NOTICE
Decision filed 06/26/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250220-U

NO. 5-25-0220

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 24-CF-258 |
| | ) | |
| STEPHAN MOSLEY, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER delivered the judgment of the court.
Justices Vaughan and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for manufacture of a controlled substance and delivery of cannabis are affirmed, where trial counsel was not ineffective for failing to file a motion to suppress the search of defendant's apartment or for calling Kenneth Pickens as a witness. Defendant's two convictions for possession of a stolen firearm are reversed where the only evidence that the firearms were stolen came from inadmissible testimonial hearsay. The affirmed convictions are remanded for resentencing, where defendant was not sentenced separately on each conviction.

¶ 2    A jury convicted defendant, Stephan Mosley, of armed violence, manufacture of a controlled substance (ecstasy), two counts of possession of a stolen firearm, and delivery of cannabis. Subsequent to the jury trial, defendant's conviction for armed violence was vacated by the trial court. Defendant now raises five claims of error, challenging those convictions. For the following reasons, we reverse in part and affirm in part.

1

¶ 3                                    I. BACKGROUND

¶ 4     On February 23, 2021, officers arrested Kenneth Pickens pursuant to an arrest warrant. They did so at the home of defendant, a friend of Pickens, whose apartment Pickens had been hiding out at. During that arrest and a subsequent protective sweep of the apartment, two firearm magazines and a bag of cannabis were found. Police obtained a search warrant based on those items for the apartment and recovered a .40 caliber handgun, a Century Arms rifle, ammunitions, more cannabis, approximately 70 grams of ecstasy, scales, and baggies. Defendant was arrested based on the items found as a result of the search warrant and charged with several offenses, including armed violence, manufacture of a controlled substance (ecstasy), two counts of possession of a stolen firearm, one for the .40 caliber handgun and the other for the rifle, both of which had been reported stolen, and delivery of cannabis.

¶ 5     Defendant was tried in front of a jury for those offenses beginning on January 21, 2025. The State's first witness was Sergeant Xavier Blackburn of the St. Clair County Sheriff's Department. Sergeant Blackburn testified that, in addition to his position with the St. Clair County Sheriff's Department, he had previously been a task force officer with the Great Lakes Regional Fugitive Task Force with the U.S. Marshals. That task force was one that was meant to track down and arrest subjects with warrants. It was pursuant to membership in that task force that Sergeant Blackburn was attempting to find and arrest Pickens. Sergeant Blackburn testified that he and other officers had received word that Pickens was at the apartment that defendant and his girlfriend, Nykeethia Pitts, shared, and that on February 23, 2021, they went to that apartment to execute the arrest warrant for Pickens.

¶ 6     Upon arrival at the apartment, Sergeant Blackburn testified that officers knocked on the door, which was answered by Pitts, who was holding a young child. Sergeant Blackburn testified

2

that Pitts appeared to be agitated and annoyed, and seemed resistant to allowing officers to see inside of the apartment. Nonetheless, Sergeant Blackburn was able to see Pickens lying on the couch within the living room area of the apartment, as well as defendant, standing inside the living room area. Officers entered the apartment to arrest Pickens, and at that time found a 9 millimeter firearm magazine and cannabis laying next to the couch by Pickens.

¶ 7     Subsequent to that, Sergeant Blackburn testified that officers performed what he termed a "protective sweep," looking to see if there was anyone else within the apartment who was not a small child. During that sweep, he kicked over a pile of clothing within what he termed the master bedroom and discovered another firearm magazine. Sergeant Blackburn testified that in his experience, people sometimes hid in such large clothing piles. At that point, officers exited the residence and obtained a search warrant. Having obtained a search warrant, officers performed a full search of the apartment. During that search, a .40 caliber handgun with an extended magazine and a Century Arms brand rifle were found within the master bedroom. Ammunition usable in the Century Arms rifle was found within the apartment during the search as well.

¶ 8     Sergeant Blackburn testified that, as a matter of course, he ran the serial numbers of both firearms through what he called a LEADS/NCIC search. That search indicated that the .40 caliber handgun had been reported stolen out of Collinsville, Illinois, and the rifle had been reported stolen out of Fairview Heights, Illinois. Trial counsel for defendant objected to the testimony regarding the results of that search on the basis of "knowledge," which the trial court sustained. Sergeant Blackburn then testified that the fact that the firearms were reported stolen should have been discovered during any legal sale of those firearms and that there was no legal way to buy stolen firearms. During cross-examination, it was, however, reiterated that both firearms had been reported stolen. Sergeant Blackburn admitted that it was not uncommon for people to sell guns on

3

the street and for the "pedigree" of such guns—such as the fact that the gun was stolen—to not be discussed during such a transaction. He also testified that the circumstances of such a transaction would indicate that it was not a "lawful sale."

¶ 9 In the kitchen, several pills amounting to around 70 grams of ecstasy were found. Sergeant Blackburn testified that was "a lot" of ecstasy and categorized it as indicating distribution rather than personal use. Cannabis weighing approximately 27 grams was also found within the kitchen along with two digital scales near to where the cannabis was found. He testified that scales like the ones found can indicate distributions, as drugs are typically sold by weight and the scales are used to weigh the drugs for sale. Plastic bags with what appeared to be cannabis residue were also found within the kitchen, which Sergeant Blackburn said was indicative of sale, as such bags were often used to carry large amounts of cannabis for distribution.

¶ 10 Both defendant and Pickens were taken to the sheriff's department after arrest and interviewed by officers. Sergeant Blackburn testified to the contents of his interview with defendant, stating that defendant confirmed he lived at the apartment officers searched with Pitts and her children. During that interview, defendant said that he was not employed and did not receive government assistance. Defendant also at no point indicated that the items found, such as the firearms and ecstasy, belonged to Pickens and agreed with Sergeant Blackburn when he stated that the things inside the apartment were his responsibility due to it being his residence.

¶ 11 A firearms expert employed by the Illinois State Police Crime Laboratory, Brian Tomac, was then called by the State to testify. He testified that the .40 caliber handgun and Century Arms rifle found during the search of defendant's apartment were both firearms in working order.

¶ 12 The State next called Joel Gray, a chemical expert employed by the Illinois State Police Crime Laboratory. He testified that the cannabis found near Pickens on the couch was, in fact,

4

cannabis and weighed 9.8 grams without packaging. The cannabis found in the kitchen was also proven to be cannabis based on chemical analysis and weighed 25.2 grams without packaging. He also analyzed the ecstasy, which came in the form of 179 tablets, confirming that it was ecstasy and weighed 61.8 grams without packaging.

¶ 13    Defense counsel then moved for a directed verdict outside the presence of the jury. First, he moved for a directed verdict on the armed violence count, arguing that case law required the guns to be immediately accessible or within the timely control of defendant and that the State had not proven that element of the offense. Defense counsel also argued that the State had not made a *prima facie* showing that defendant knew the two firearms, the .40 caliber handgun and the Century Arms rifle, were stolen. Defense counsel also argued, as part of asking for a directed finding on those two counts, that "there is some factual dispute, I would say, as to who owned those weapons as well." Defense counsel also requested a directed finding with regard to the cannabis and ecstasy charges, claiming the State had not shown who owned those items. The trial court denied the motion, finding that defense counsel's contentions were factual disputes to be resolved by the jury.

¶ 14    Following the motion and prior to the defense presenting its witness, a jury instruction conference was held. During that conference, the State presented non-pattern jury instructions for the offense of possession of a stolen firearm, noting, correctly, that there were no Illinois pattern jury instructions for either the definition or issues instruction for that offense. Defense counsel had no objection to either of the State's proposed jury instructions as to that offense, noting for both that he believed the proffered non-pattern jury instructions followed the statute.

¶ 15    Defendant then called Pickens to testify. Pickens testified that he was currently incarcerated in the Illinois Department of Corrections pursuant to a shooting case and that prior to that he had

5

been living in East St. Louis. He testified that defendant was a friend from school and that he was arrested for his shooting case while at defendant's apartment. He indicated that he was aware that contraband was found within defendant's apartment when he was arrested and affirmed that he had discussed those items with police during an interview, although, due to the passage of time between the interview and testifying, he did not recall everything about the interview. He did testify that he was asked about the contraband, specifically whether it belonged to defendant or Pitts, and that, during the interview, he denied knowing anything about the contraband.

¶ 16    Pickens then testified that after his interview with police and after he was incarcerated for his shooting case, he sent defense counsel an affidavit. He testified that no one told him to write that affidavit, nor what to say in it, and that in the affidavit he admitted that the contraband found in defendant's apartment belonged to him. Specifically, Pickens testified that the "AK-47, the Molly, [and] the Fentanyl" were all his. Pickens later clarified that the "Molly" was ecstasy.

¶ 17    Pickens was then shown photos in the form of previously admitted exhibits showing the contraband at issue, although none of the exhibits were identified during his testimony. He was first shown a picture of a firearm that he claimed he neither owned nor had seen defendant with, but believed he had seen defendant's brother in possession of. He was then shown a photo of the "AK-47," a term previously used to describe the Century Arms rifle at issue, and stated that was his firearm. Only two firearms were found within the apartment, leading to the reasonable conclusion that the gun depicted in the first photo Pickens was shown was the .40 caliber handgun. Pickens asserted that he understood he was currently under oath, that he was not under oath when interviewed by police, and that no one had threatened him or made him any promises in exchange for his testimony.

6

¶ 18    During cross-examination, the State went into some details of Pickens' shooting case and also asked him about the contents of his interview with police after his arrest. Pickens indicated that during the shooting case, he used a 9-millimeter firearm, but denied possession of the 9-millimeter firearm magazine found near him during his arrest or knowing who it belonged to. Pickens was asked specifically whether he denied knowing about the ecstasy during the police interview and he asserted that it must be "some shit" that defendant sold and initially denied those statements. He then amended his denial by stating he did not remember and that he "wasn't correct with" police during his interview.

¶ 19    Pickens stated that he was telling the truth during his testimony but that he lied to police during his interview. Regarding the lies Pickens told to police, the State asked whether he had lied about not knowing where the 9-millimeter used in his shooting case was during the interview. When asked where the 9-millimeter was during his testimony, he denied knowing where it was, asserting he forgot where he had put that gun. Pickens also asserted that he did not remember denying ownership of the guns at issue in the case, but agreed that he probably had done so. Pickens did admit that during the police interview, he "didn't own up to nothing." When asked why it took him so long to write the affidavit and admit ownership of the gun and ecstasy, Pickens indicated that he had only done so after being incarcerated because "at the time I didn't want to own up to it because I was trying to get less time. And most of the time when you get arrested from somebody's housed and there be something there, they throws it out, which I thought you did."

¶ 20    When asked about his purchase of the Century Arms rifle, Pickens stated he was not "for sure" whether it was stolen or not and that he did not know the person he bought it from. When asked to explain the circumstances of the purchase, he claimed he bought it in the "ghetto" and that someone had asked him if he wanted to buy a gun. He admitted he was not able to legally

7

purchase firearms. Pickens testified that it was common for people from East St. Louis, such as himself, to buy firearms on the street. Pickens testified that he had not specifically asked whether the gun was stolen and that he never noticed any price differentials for potentially stolen guns versus other guns sold on the street. Pickens explained that he had the Century Arms rifle on him when he went to defendant's apartment and that it should have been in a kitchen cabinet when police found it, as that was the last place he put it. When asked about it being found in a bedroom, Pickens stated he did not recall putting it there. He also asserted that the ecstasy should have been on a table and that if police found it elsewhere he "guessed" it had been moved by someone else, but really did not recall.

¶ 21    In rebuttal, the State called Detective Benjamin Vise. Detective Vise testified that he was a detective with the Sangamon County Sheriff's Department and interviewed Pickens after his arrest on February 23, 2021, along with Sergeant Blackburn. The State then laid a foundation and played two clips from that interview. In the first clip, Pickens was asked about the ecstasy pills and stated that the items found on him were his, but that he did not know about anything else. During that clip, Pickens further asserted regarding the ecstasy "I guess that's some shit he sell." In the second clip, Pickens denied carrying guns or that the guns found in the apartment were his. He also stated that he was not saying the guns were "his or hers" but asserted they were not his. During his testimony, Detective Vise added context to the clips, indicating that the masculine pronouns used in the interview were referring to defendant.

¶ 22    During closing argument, the State argued that Pickens was not credible, both because his story about bringing guns and drugs to the apartment and spreading them around during his only occasion having spent the night there was outlandish and because Pickens had not remembered where the items were located within the apartment. The State also argued that defendant had

8

constructive possession over the firearms, as they were in his apartment, and this was true even if one were to believe that Pickens was the one who brought either or both of the guns to the apartment. It later made a similar argument with regard to the ecstasy, although the State strongly contended during the entirety of closing arguments that Pickens had been untruthful in his testimony. The State further asserted that defendant had knowingly bought stolen guns, because, with the guns having been entered into LEADS/NCIC as stolen, there was no way to legally purchase them and the circumstances of the firearms' purchase would have reasonably induced defendant to believe they were stolen, even if he did not ask questions about how Pickens acquired them. With regard to the cannabis and defendant's possession, the State pointed out that even in his testimony at trial, Pickens had not claimed possession of the cannabis.

¶ 23 Defense counsel argued that the State had not met its burden. He contended that the State had not shown the sort of immediate access or timely control over the firearms necessary for an armed violence conviction, in particular because defendant was immediately placed under the control of police where he could not access the weapons. With regard to the charges of possession of a stolen firearm, defense counsel first argued that the State had not proven defendant knew the firearms were stolen, because street sales were too common and could be conducted without much fanfare due to money problems just as easily as the guns at issue being stolen. He also argued that the guns and drugs actually belonged to Pickens. Defense counsel argued that Pickens' earlier statements to police denying possession were predictable lies because, at the time, he faced potential liability for possessing them. He contrasted this with the shooting where Pickens admitted to committing the offense during the interview, but claimed it was an act of self-defense. Defense counsel also pointed out the lack of forensic evidence, such as fingerprints, linking defendant to either the drugs or guns.

9

¶ 24 Defendant was found guilty of all counts and scheduled for sentencing and posttrial motions on March 12, 2025. Prior to that date, on February 21, 2025, defendant filed a posttrial motion for a new trial. In that motion, defendant asserted that he had not been proven guilty beyond a reasonable doubt of all the offenses. More specifically, he argued that the offense of armed violence had not been proven, based on the resemblance of the facts in his own case to cases such as *People v. Condon*, 148 Ill. 2d 96 (1992) and *People v. Smith*, 191 Ill. 2d 408 (2000), which held that the defendants did not have legally sufficient possession over weapons to sustain the charge of armed violence.

¶ 25 After a hearing on defendant's posttrial motion for a new trial, the trial court denied defendant's motion with regard to all but the conviction for armed violence, which it vacated pursuant to the motion, although the trial court did indicate it was a "close call." The case then proceeded to sentencing. No evidence was presented by either side, although defendant did make a statement in allocution. Ultimately, defendant was sentenced to 12 years in the Illinois Department of Corrections for manufacture of a controlled substance, five years for each of the two possession of a stolen firearm counts, and two years for delivery of cannabis, all to be served concurrently. This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27 On appeal, defendant challenges his convictions by asserting five different claims of error. Defendant challenges his two convictions for possession of a stolen firearm by claiming that he was convicted through the use of improper testimonial hearsay and because the jury instructions did not correctly state the law. He also claims that defense counsel was ineffective for allowing both errors. In the event that neither of those claims are, by themselves, enough to overturn those convictions, defendant claims that there was cumulative error in the form of ineffective assistance

10

of counsel by defense counsel. Defendant also challenges all four of his convictions, by arguing that defense counsel was ineffective in two separate fashions. First, he argues that counsel was ineffective for not filing a motion to suppress the search that produced the ecstasy, firearms and a portion of the cannabis, as the evidence that formed the basis for the search warrant was obtained via an overly broad, and therefore illegal, protective sweep. Second, he claims that counsel was ineffective for calling Pickens to testify, as this allowed the State to bring in statements by Pickens during his interview that would not otherwise have been admissible.

¶ 28                     A. Possession of a Stolen Firearm

¶ 29    We first address defendant's claim that he was convicted of both counts of possession of a stolen firearm by the use of testimonial hearsay, as we find this claim dispositive as to those counts. Defendant claims that he was convicted of possession of a stolen firearm on the basis of testimonial hearsay evidence in the form of Sergeant Blackburn's testimony that the two firearms at issue were listed in the LEADS/NCIC system as "stolen." Defendant claims that, because this hearsay was testimonial and he was never given the opportunity to cross-examine whoever made the statements, it violated his rights under the confrontation clause and thus should be reviewed *de novo*. The State claims that defendant did not preserve this issue for review, and also that the contested testimony was not hearsay due to being presented under what is sometimes colloquially referred to as the 'investigation exception.' The State contends that the relevant standard of review is that of the admissibility of evidence and thus an abuse of discretion standard.

¶ 30    The State is correct that defendant failed to preserve this error for review, which defendant acknowledges. Defendant thus asks that this error be reviewed for plain error. Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) sets out the plain error rule as follows: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the

11

trial court." The plain error rule allows for review when one of two prongs are met: "(1) where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence or (2) when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Jackson*, 2022 IL 127256, ¶ 19. "Under both prongs, the defendant has the burden of persuading the court to excuse his forfeiture." *Id.* In order to determine whether there is plain error, a court must first determine whether any error occurred. *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009).

¶ 31    Illinois Rule of Evidence 801(c) (eff. Oct. 15, 2015) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The investigation 'exception' to the hearsay rule applies when a statement is "offered for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). The investigation exception is not truly an exception to the hearsay rule, but rather a statement that is not hearsay because, rather than being offered for the truth of the matter asserted, it is limited to showing how an investigation was conducted. *Id.*

¶ 32    To prove the offense of possession of a stolen firearm, the State must show, per the statutory language that the defendant (1) is not entitled to the possession of the firearm, (2) possessed the firearm, and (3) knew it to have been stolen or converted. 720 ILCS 5/24-3.8 (West 2022). Implicit in that third element, is also the element that the firearm actually was stolen, as one cannot reasonably know a firearm is stolen unless it is, in fact, stolen. Indeed, in the case of the related offense of theft under section 16-1(a)(4) of the Criminal Code of 2012 (*id*. § 16-1(a)(4)), what is termed "Theft By Obtaining Control Over Stolen Property" in the Illinois Pattern Jury

12

Instructions, identification of the true owner of stolen property is a necessary element of that offense, as "without proof of an identified 'owner,' there is no real proof the property was stolen." *People v. Karraker*, 261 Ill. App. 3d 942, 956-57 (1994); see 720 ILCS 5/16-1(a)(4) (West 2022); see also Illinois Pattern Jury Instructions, Criminal, No. 13.23 (approved December 8, 2011). Thus, to prove the offense of possession of a stolen firearm, there must also be proof that the firearm was actually stolen, in the form of an identified owner.

¶ 33     In this case, the only evidence that the .40 caliber handgun and Century Arms rifle were stolen was Sergeant Blackburn's testimony that they returned as stolen when he ran their serial numbers through the LEADS/NCIC database. While that testimony could, as the State asserts, be admissible under the investigation 'exception,' such admissibility would, by its nature, not be substantive evidence. If that testimony was not substantive, then there is no proof within the record showing that the firearms at issue were stolen.

¶ 34     Assuming that the testimony was admitted substantively, and thus the State actually did prove that the guns were stolen, this hearsay would also have been admitted in violation of the defendant's rights under the confrontation clause. In *Crawford v. Washington*, 541 U.S. 36, 51-56 (2004), the United States Supreme Court announced the rule that a defendant's confrontation clause rights are implicated when "testimonial" statements are used against him, without the defendant having the opportunity to cross examine that statement's proponent. The Court declined to give an exact definition of what statements were "testimonial" in *Crawford*, and instead defined it in a later case, *Davis v. Washington*, 547 U.S. 813, 823-29 (2006).

¶ 35     In *Davis*, the Court established that statements were testimonial when they were the result of police interrogation, the primary purpose of which was to "establish or prove past events potentially relevant to later criminal prosecution" rather than to "enable police assistance to meet

13

an ongoing emergency." *Davis*, 547 U.S. at 822. The statements that the firearms at issue in this case were stolen clearly meets the former, rather than the latter, purpose and thus is unquestionably testimonial. It is also uncontroverted that the proponents of those statements were never subject to any sort of cross-examination by defendant. As such, any substantive admission of the testimony was in violation of the confrontation clause.

¶ 36 Having thus established that there was error, the question then becomes whether the error amounts to plain error. We find that it does amount to first prong plain error, as defendant was clearly prejudiced by the error. The only potential evidence supporting an entire element of the offense was hearsay admitted in violation of the confrontation clause. Given that, the evidence was so closely balanced that the jury's verdict undoubtedly resulted from the error rather than from any properly admitted evidence, resulting in first prong prejudice. As such, defendant has clearly established first prong plain error and the convictions for possession of a stolen firearm should be reversed.

¶ 37 Because we find that defendant's claim of plain error regarding the testimonial hearsay completely resolves his appeal with regard to his convictions for possession of a stolen firearm, we need not address his other contentions of error with regard to those convictions on appeal. *People v. Barger*, 2020 IL App 3d 160316, ¶ 18. As such, we do not reach defendant's contentions of ineffective assistance of counsel as to this issue, nor either claim of error with regard to the non-pattern jury instructions for those counts, nor his claim of cumulative error with regard to ineffective assistance of counsel.

¶ 38 B. Manufacture of a Controlled Substance and Delivery of Cannabis

¶ 39 Defendant also challenges his convictions for manufacture of a controlled substance and delivery of cannabis, via two separate allegations of ineffective assistance of counsel. First, he

14

argues that defense counsel was ineffective for failing to file a motion to suppress the search of his apartment on the basis of an impermissibly expansive protective sweep. Second, he argues that defense counsel was ineffective for calling Pickens as a witness, as his testimony was not helpful and instead permitted the State to play damaging clips from Pickens' police interview which would not otherwise have been presented to the jury.

¶ 40 To establish a claim of ineffective assistance of counsel, the defendant must show (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must show both deficient performance and prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* In judging trial counsel's performance and determining whether such performance was deficient, the Court must look at whether counsel's performance "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Id.* at 687-88. In finding deficiency, there is a "strong" presumption that the challenged action or inaction was the product of sound trial strategy rather than incompetence. *Id.* at 690. Prejudice occurs when there is a "reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different," with reasonable probability being defined as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A defendant must show both deficient performance and prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* A failure to establish either deficient performance or prejudice will thus be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 41 Defendant claims that defense counsel was ineffective for failing to file a motion to suppress based on the search of defendant's apartment. On February 23, 2021, officers went to defendant's apartment to arrest Pickens, who had an active arrest warrant. During the arrest of

15

Pickens, who was laying on the couch visible from the apartment's front door, a bag of cannabis and a gun magazine were found in plain view next to the couch. Officers subsequently performed what they termed a "protective sweep," implicitly invoking *Maryland v. Buie*, 494 U.S. 325 (1990), checking for potential occupants of the apartment other than children. During that search, Sergeant Blackburn kicked a pile of clothing in the master bedroom, indicating that based on his training and experience, people will sometimes hide in such piles. As a result of kicking that laundry pile, he found a firearm magazine. Subsequent to that discovery, a search warrant was obtained and two firearms and ecstasy were found in the apartment.

¶ 42    Defendant argues that the protective sweep performed by officers fell outside the permissible bounds outlined by *Buie*, and that his attorney should have filed a motion to suppress, which would have resulted in the exclusion of the ecstasy defendant was convicted of manufacturing and the cannabis he was convicted of possessing for the purposes of delivery[1]. *Buie* outlines two different types of warrantless protective sweeps that officers may perform incident to an arrest. *Id*. at 334-36. The first is a suspicionless search of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* The second is one based on articulable facts "which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* Both types of searches are "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found" and may last "no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* Defendant argues that the search in this case fits neither type of *Buie* search, as

---

[1]Defendant also argues that this would have suppressed the firearms forming the basis for his convictions for possession of a stolen firearm, but as we have already determined that reversal is warranted as to those convictions, we will not be discussing that here.

16

searching the bedroom was outside of the spaces "immediately adjoining the place of arrest," and thus was broader than allowed under the suspicionless *Buie* search, and that officers lacked articulable facts to justify a more robust search. Defendant further asserts that had trial counsel filed a motion to suppress, it would have been granted, suppressing all the evidence needed to convict defendant of the offenses he was charged with. Defendant thus argues that trial counsel was deficient for failing to file the motion and defendant was prejudiced by this deficiency.

¶ 43     The State counters that the protective sweep in this case was not broader than allowed for a suspicionless *Buie* search, pointing to several cases from federal courts holding that the definition of "immediately adjoining" is more flexible when it comes to smaller spaces, because of the greater feasibility of a potential attack in such spaces. (see *United States v. Kirk Tang Yuk*, 885 F.3d 57 (2nd Cir. 2018); *Clark v. Webster*, 384 F. Supp.2d 371 (D. Me. 2005); *United States v. Sinclair*, 2012 U.S. Dist. LEXIS 158445 (W.D.N.Y. Nov. 2012); *United States v. Lauter*, 57 F.3d 212 (2nd Cir. 1995); United States v. Robinson, 775 F. Supp. 231 (N.D. Ill. 1993)). Notably, in *People v. Matthews*, 2025 IL App (1st) 240412-U, the First District looked to some of these same cases in ruling that a defendant's attorney was not deficient for failing to file a motion to suppress. In so doing, that court held that "where, as here, the search involves a small apartment, a protective sweep of a room or other space adjacent to the place of arrest will be permissible under the 'immediately adjoining' exception, where 'an attack could be immediately launched' from that location," adopting the reasoning of the federal courts. *Id*. ¶¶ 36-37 (quoting *Buie*, 494 U.S. at 325). We concur with the First District, finding that the federal standard, applied across many federal circuits, is a correct statement of the law with regard to the meaning of what it is for something to be "immediately adjoining" with reference to small living spaces.

¶ 44    Here, it is unclear based on the record whether the search of the master bedroom was within the scope of a suspicionless *Buie* search. All that is known is that it was an apartment with at least two bedrooms within an apartment building. The apartment could have been either small or sizeable based on those circumstances. In general, trial counsel's decision to file or not file a motion is "a matter of trial strategy which will be afforded great deference." *People v. Hobley*, 182 Ill. 2d 404, 454 (1998). Given the uncertainty about the apartment size, the defendant has not overcome the strong presumption that trial counsel's failure to file a motion to suppress was the product of trial strategy. The fact may be that the apartment was small enough that it could, in its entirety, be considered immediately adjoining for the purpose of *Buie* and in the absence of facts showing otherwise, we must assume this was a sound assessment, based on the presumption that defense counsel's failure to file the motion was a matter of trial strategy. Thus, defense counsel was not ineffective for failing to file a motion to suppress.

¶ 45    Defendant also claims that trial counsel was ineffective for calling Pickens as a witness, claiming that doing so allowed the State to utilize Pickens' prior inconsistent statements to police and that no competent attorney would have chosen to present his testimony. The decision to call or not call a witness to testify at trial is generally a matter of trial strategy and therefore generally not a basis for deficient performance by counsel. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). This is clearly one such example. Certainly, there were drawbacks to calling Pickens to testify. However, that ignores the benefits of calling a witness who was willing to claim ownership of many of the items defendant was charged with illegally possessing, including the ecstasy and one of the two firearms. Moreover, Pickens even offered an explanation as to the .40 caliber handgun other than defendant's ownership of that firearm. Further, while Pickens had previously denied ownership, he presented a cognizable explanation for his prior statement that he was worried about

18

criminal responsibility for those items but no longer had those concerns after pleading guilty to a different charge. The fact that the strategy did not work does not make it anything other than trial strategy. Trial counsel was not deficient for calling Pickens to testify and therefore was not ineffective.

¶ 46                                    C. Remand

¶ 47    Having vacated two of defendant's convictions, the question then becomes whether we must remand the affirmed convictions back to the trial court for the purposes of resentencing. Resentencing is not required when the trial court "sentenced defendant separately on each conviction, and the record does not otherwise show that the court considered the vacated convictions in imposing sentence on the remaining conviction." *People v. Maggette*, 195 Ill. 2d 336, 354-355 (2001). Here, it is not clear that defendant was sentenced separately on each conviction or that the trial court did not consider the convictions for possession of stolen firearms in pronouncing its sentence for the affirmed counts of manufacture of ecstasy and delivery of cannabis. Indeed, in pronouncing its sentence, the court seemed to take all counts into consideration, stating:

> "So you have stolen weapons, a large amount of Ecstasy, a large amount enough of cannabis—even though cannabis is readily available—I don't know what the street price is for cannabis as compared to the dispensaries. But you know, the fact remains that you even had cannabis in an amount that suggests and allows for the jury to find that it was possessed with the intent to deliver the cannabis.
>
> So however you want to look at it—however—whatever labels we put on it, the fact is that you had in your home a very dangerous circumstance. And that has to be responded to with punishment."

19

Based on this, we believe that remand for resentencing on the affirmed counts, manufacture of ecstasy and delivery of cannabis, is warranted.

¶ 48                                    III. CONCLUSION

¶ 49     For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County in part and reverse in part, vacating defendant's two convictions for possession of a stolen firearm. We further remand the matter to the trial court for resentencing as to the affirmed counts.

¶ 50     Affirmed in part, and reversed and vacated in part; cause remanded.